JOHN I. PIERCE, APPELLEE, v. CARL J. MILLER, APPELLANT.

FILED MARCH 1, 1922. NO. 21889.

1. Evidence: MARKET VALUE. The market price of grain cannot be established by a quotation from a weekly newspaper, where the publisher has obtained his only knowledge of such price from a dealer in the vicinity.

2. ———: MARKET REPORTS. "Market reports in journals, such as the commercial world relies upon, are competent evidence of the state of the market." *Chicago, B. & Q. R. Co. v. Todd*, 74 Neb. 712.

3. ———: BURDEN OF PROOF. Where a party affirmatively pleads the existence of a fact material to the issue, he thereby assumes the burden of proving such fact.

4. Trial: INSTRUCTIONS: BURDEN OF PROOF. The court gave this instruction in part: "If the defendant (plaintiff) had 1,350 bushels of seed that was marketable, suitable and fit for seeding and planting purposes, he had the right, under his contract, to deliver it to the defendant, or so much thereof as was marketable, fit and suitable for seeding and planting purposes. Before the defendant is entitled to recover herein he must show by a fair preponderance of the evidence that the seed delivered on April 11, 1918, was unmarketable, unfit and unsuitable for seeding and planting purposes, but also he must show by a preponderance of the evidence that all of plaintiff's seed was unmarketable and unfit for seeding and planting purposes, and that by reason of said fact the plaintiff was unable to comply with his part of said contract." *Held*, the instruction is erroneous, plaintiff having assumed the burden of proof by having

pleaded ability, readiness and willingness to deliver the seed in question to defendant.

5. **Sales:** ACTION FOR DAMAGES: BURDEN OF PROOF. Where plaintiff sold 1,350 bushels of cane seed to defendant and a part of it was spoiled while in plaintiff's possession, the burden is on plaintiff to show by a preponderance of the evidence that he had on hand and ready to deliver to defendant, on the date when it was alleged defendant violated the contract, marketable cane seed reasonably approximating the amount which he contracted to deliver.

6. ———: CONTRACT: CONSTRUCTION. Where plaintiff contracted to deliver about 1,350 bushels of Black Amber cane seed, the use of the word "about," without any other explanation in the contract, will require the delivery of the specific quantity within a reasonable limit, the quantity expressed, though qualified by the word "about," being material and controlling, subject to reasonable variation.

APPEAL from the district court for Hitchcock county: HANSON M. GRIMES, JUDGE. *Reversed.*

*John F. Cordeal,* for appellant.

*Stewart, Perry & Stewart* and *C. W. Meeker, contra.*

Heard before LETTON, DEAN and DAY, JJ., ALLEN and BEGLEY, District Judges.

DEAN, J.

Plaintiff sued to recover damages for an alleged breach of a written contract which purports to obligate plaintiff to sell and defendant to buy a quantity of cane seed at a price therein stipulated. The case was tried twice. On the second trial plaintiff recovered a verdict and judgment for $3,095.82, and defendant appealed.

The contract reads: "Purchase of Cane Seed. Jan. 22, 1918. I agree to and do sell to C. J. Miller, about 1,350 bus. of Black Amber cane, price in consideration to be and is $4.50 per bus. $100 cash is paid on this contract which is hereby acknowledged. Seed to be delivered at Stratton within 30 days, on or before Feb. 22, 1918. Balance of payment to be made when seed is delivered. C. J. Miller, buyer, J. I. Pierce."

Plaintiff and defendant are farmers. But in the fall and winter defendant engaged in the business of buying amber cane seed for shipment to seed houses. The seed in question was raised on plaintiff's farm, about six miles distant from Stratton. When threshed, in the fall or winter, it was hauled by plaintiff's boys from the threshing machine and shoveled by them into five bins on their father's farm. It appears that some of the seed was wet when it was threshed and that later snow blew into some of it.

Plaintiff testified that some time in February defendant sent word that he wanted him to bring in a load of seed to fill out a car which he was loading for shipment at the time, and that he refused. The reason he gave for his refusal was that "it blowed so, it would be impossible to take it in the wagon that day. Q. That was the reason you did not take it? A. That was the reason I did not take it; it blowed so." Elsewhere in the record it appears that defendant had one or more loads of unsacked cane seed brought in from the country the same day. This was done by resorting to the usual expedient which is practiced among farmers and grain-men of protecting seed or grain from the wind by fastening horse blankets or canvas over the top of the wagon-box.

April 11, 1918, plaintiff hauled two wagon-loads of cane seed to Stratton, consisting of 152.20 bushels, which he says defendant accepted. He further testified that on the same day defendant repudiated the contract and told him he would accept no more of the seed. Defendant's evidence and plaintiff's admissions clearly show that both loads had been wet and had heated and were considerably damaged. Respecting the condition of the two loads plaintiff testified: "It was really damp, and it was not damp; some of it was damp, and some of it was not; by the window hole, where the snow blowed in it was damp, and commenced to warm up."

Two farmers testified that they examined one of plain-

tiff's loads at the car, and that the seed was hot and musty, and that its germinating quality was thereby greatly impaired, if not destroyed. The substance of the evidence of two other farmers, besides defendant, was to the effect that cane seed which was heated and caked would not germinate and was valueless.

The main witnesses upon whom plaintiff relied to establish his case, besides himself, were his two sons, Alva and Charles, and his stepson, Robert Woods. The record shows that the testimony of the latter differs on material points from the evidence given by him at the former trial. Plaintiff's son Alva testified that he and his brother Charles hauled the two loads in question to town, and when they drove up to the car which was being loaded by defendant it was about three-fourths full. He said that when they got their load almost all shoveled into the car defendant, who up to that time had been inside the car shoveling the seed back, told his father that the seed which they had thrown into the car was damp. He further testified that when defendant found the other load was also damp he said it would have to be put into another bin. Alva also testified that the load which was put into the bin was damp and that the load which they put in the car was in about the same condition. He admitted that defendant told his father that the load which was shoveled into the car was not only damp, but that it "was not up to quality." Charles Pierce, the other son, admitted that "both loads were a little warm."

There is a dispute as to whether plaintiff or defendant got the bin into which the second load of damaged grain was shoveled. Defendant's uncontradicted evidence is that it spoiled in the bin and was thrown away, but by whom he did not know. Plaintiff testified that defendant told him to bring in the damaged seed, but this was denied by defendant.

Defendant's first assignment of error has to do with plaintiff's proof respecting the market value of the seed

Pierce v. Miller.

at Stratton April 11, 1918.  The Stratton Weekly News of that date, over defendant's objection, was received in evidence.  Its local market column quoted cane seed at $3 a hundred pounds.  The publisher testified that he printed the quotations just as he received them from the elevator, sometimes obtaining his information from one elevator at Stratton and sometimes from another.  He had no knowledge about the price, at the time of the trial, except as he obtained it from his newspaper, nor did he know whether any cane seed was bought by the elevators at Stratton on that date, nor did he know from which elevator he obtained his information.  He said he always got the price quotations in the afternoon of Thursday of each week just before the newspaper forms were locked.

In *Fahey v. Updike Elevator Co.*, 102 Neb. 249, it is pointed out that prices of grain on the open market are properly shown by authentic publications or trade bulletins which are adopted by grain dealers generally as standards.  In *Chicago, B. & Q. R. Co. v. Todd*, 74 Neb. 712, it is said:  "Market reports in journals, such as the commercial world relies upon, are competent evidence of the state of the market."  The market reports offered by plaintiff were purely hearsay and come within the inhibition of the rule which provides that newspapers containing quotations, obtained as they were in the present case, are not admissible in evidence.  10 R. C. L. 1167, sec. 367.  The evidence of the editor did not purport to relate to transactions which were actually consummated in good faith and in the usual course of business.  In 22 C. J. 188, sec. 152, it is said:  "The usual records of sales or the conditions of markets, such as newspaper market reports, or prices current, are generally deemed competent evidence of market value, especially when accredited by the party against whom they are offered, provided the quotations are shown to represent transactions actually consummated or proposed in good faith, and to have been obtained from authoritative or reliable sources in the usual course of business."  To substantially

the same effect is the recent case of *Doherty v. Harris*, 230 Mass. 341.

Clearly the publication in question, measured by the standard to which reference is herein made, was not competent evidence. It was not a trade bulletin, nor was it a periodical accepted by grain dealers generally as a standard for the purpose of fixing the price of grain and of seeds. We conclude that defendant's assignments of error must be sustained. However, the record is not without competent evidence of the value of cane seed in Stratton, April 11, 1918. Defendant and a local dealer, who was disinterested, and who had both bought cane seed that day, testified that the market value was then $5.80 a hundred pounds.

Defendant complains of that part of instruction No. 6 which placed the burden upon him of establishing the fact "that at the time and place of the delivery by plaintiff of a portion of the seed all of his seed had become heated, was unmarketable and unfit and unsuitable for seeding and planting purposes."

We do not think the instruction follows the recognized rule. It is elementary that in no case can the burden of proof shift from the party having to establish the affirmative of an issue which properly falls upon him who has the affirmative of the issue as determined by the pleadings. 35 Cyc. 586, 589.

Plaintiff assumed the burden by pleading that "he was possessed of much more cane seed than was necessary to fulfil this contract of 1,350 bushels to defendant, and was at all times from the making, signing and executing of said contract prepared, ready, willing, anxious and able to fulfil said contract and deliver to said defendant said cane seed as per his agreement in said written contract."

Instruction No. 7 is complained of by defendant. The instruction reads in part: "If the defendant (plaintiff) had 1,350 bushels of seed that was marketable, suitable and fit for seeding and planting purposes, he had the

right, under his contract, to deliver it to the defendant, or so much thereof as was marketable, fit and suitable for seeding and planting purposes.  Before the defendant is entitled to recover herein he must show by a fair preponderance of the evidence that the seed delivered on April 11, 1918, was unmarketable, unfit and unsuitable for seeding and planting purposes, but also he must show by a preponderance of the evidence that all of plaintiff's seed was unmarketable and unfit for seeding and planting purposes, and that by reason of said fact the plaintiff was unable to comply with his part of said contract."

The instruction is erroneous, in that by it the jury were informed generally that plaintiff had the right to deliver the 1,350 bushels of seed, "or so much thereof as was marketable, fit and suitable for seeding and planting purposes."  The instruction does not correctly state the rule as it should be applied to the facts.  The rule is well stated in 23 R. C. L. 1353, sec. 177:  "The word 'about' as used in estimating the quantity to be delivered is given practically the same effect as the phrase 'more or less;' its use is only for the purpose of providing against accidental variations arising from slight and unimportant excesses or deficiencies in number, weight or measure. And it has been held that the delivery and receipt of 4,634 tons of coal, under a contract for the delivery and acceptance of 'about 5,000 tons,' does not so complete the contract as to entitle the buyer for that reason to refuse a tender of the remaining 366 tons.  Likewise it has been held that a contract calling for the delivery in instalments of 'about 1,000 tons' per month is not fulfilled by the delivery of 400 tons in one month and 885 tons in another."

23 R. C. L. 1352, sec. 176, points out that the use of the phrase "more or less" in a contract for the sale of personal property "is an absolute contract for a specific quantity within a reasonable limit; the quantity expressed, though qualified by the phrase 'more or less,'

being still material and controlling, subject to reasonable variation."

The latter part of instruction No. 7 repeats the erroneous feature which we have discussed in instruction No. 6 and need not therefore be further noticed.

Defendant tendered certain instructions which were refused. But, in view of what we have said with respect to the law governing the case, we do not think it necessary to extend this opinion by further discussion. For the errors pointed out, we conclude that the judgment of the district court must be reversed and the cause remanded for further proceedings not inconsistent with the views expressed in this opinion.

REVERSED AND REMANDED.