IN RE ESTATE OF SANFORD C. BOWMAN.
LENA BOWMAN ET AL., PROPONENTS, APPELLANTS, V.
CLARENCE C. BOWMAN, CONTESTANT, APPELLEE.
9 N. W. (2d) 801

FILED JUNE 4, 1943. No. 31549.

·*G. J. McGinley* and *Beeler, Crosby & Baskins,* for appellants.

*Hoagland, Carr & Hoagland, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This is a will contest. An instrument, purporting to be the last will and testament of Sanford C. Bowman, was offered for probate by Lena Bowman, his wife, and Carl L.

Bowman, his brother. Clarence C. Bowman, a brother, filed objections to probate, hearing was had in the county court, and the will was not admitted to probate. Proponents appealed to the district court.

The answer to the petition and objections to probate alleged lack of testamentary capacity and that the will was the product of undue influence. The reply was a general denial. The case was tried to a jury and a verdict returned, with a finding that the testator possessed testamentary capacity, but that the will was the product of undue influence and was not the last will and testament of Sanford C. Bowman, deceased. Motion for a new trial was overruled. The court entered judgment to conform with the verdict. The proponents appealed, assigning as error that the verdict and judgment are contrary to the evidence and not supported by sufficient evidence. This raises the only question for review in this court; that is, whether or not the evidence is sufficient to warrant submission to the jury on the proposition of undue influence. This requires a review of the evidence. We refer to the material parts thereof as occasion requires. In this connection, some of the family history is appropriate.

Harry Bowman and his wife Hannah, the father and mother of Sanford, Clarence and Carl Bowman, came to Lincoln county, Nebraska, in 1888, took a homestead and timber claim, and engaged in farming and ranching. The father became seriously ill in 1898 with a mental disorder and died in 1901. His wife died three weeks thereafter. The estate of the parents consisted of a half section, the homestead, and timber claim, farm machinery and live stock. At the time of their parents' death Sanford was approximately 35, Clarence 32, and Carl 15 years of age. Sanford had charge of the home place for five or six years before his father died. Clarence farmed on another place for a year in 1896, then moved onto his own homestead which cornered the home place. He married in 1899. Sanford homesteaded a mile south of the home place. Carl stayed with Sanford a short time until he finished school at about

17 years of age; also stayed at Clarence's and worked out. Carl secured his own place in 1914 or 1915, a homestead, which he later traded off. He married Mary Schrader July 27, 1921, and Sanford married Lena Schrader, her sister, in 1929, when he was 61 years of age. On June 1, 1909, Clarence and his wife conveyed to Sanford by quit-claim deed their interest in the father's home quarter and the tree claim. This deed recited the consideration as $300; the deed was never recorded. Clarence testified that it was without consideration and was for the benefit of Carl. In 1902 Sanford foreclosed a tax sale on the homestead, taking a deed thereto in his own name in 1906, and in 1909 he deeded a quarter-section of the land to Carl. Neither deed was recorded.

Sanford continued to farm the home place until he had a sale in 1921; thereafter the rents were collected by and for him until his death. At the time of Sanford's death, December 17, 1941, he was 74 years of age. Clarence owned 960 acres of land in Lincoln county, valued at not to exceed $11,000. He owned an acre of land in Oregon, five or six head of cattle and $200 in money. Carl was in the merchandising business at Ogallala, Nebraska, and had a stock of goods of the net value not to exceed $20,000, and owned his own home. Sanford's estate was valued at approximately $60,000.

Evidence of the financial condition of a contestant in a will contest is properly received and may be considered with other evidence in the case as bearing upon the issue of undue influence in execution of the will where the issue is in the case by proper pleadings. Especially is this true where the contestant is in close relationship to the testator, and claim is made that the provisions of the will are unnatural. See *In re Estate of Noren,* 119 Neb. 653, 230 N. W. 495.

The will provided for the payment of funeral charges, administration expenses and just debts, to be paid out of the personal property, and if it be insufficient then out of the sale of real estate, and gave to his wife Lena and his brother Carl, "share and share alike, all of the rest and

residue of my estate * * * in fee simple;" the bequest and devise made subject to the homestead interest of the wife in and to the property occupied as a residence by the testator at the time of his death. Carl was appointed executor. The will was made October 24, 1938, was deposited in the office of the county judge of Logan county on October 26, 1938, and there it remained until it was opened and filed December 22, 1941.

After the death of their parents, Sanford and Clarence helped each other, exchanging work and neighboring, and Sanford would often visit Clarence's home. In 1910 Sanford became seriously ill. He was afraid to stay alone and went over to Clarence's home and remained about a month, and was cared for by Clarence's family. Sanford was nervous and believed that he was "going to go like his father did;" that is, he felt as though he were mentally affected. He later went to the home of Clarence's wife's father, remained there approximately a month, and returned to Clarence's home for a month. The cause of his illness was worry over the loss of some money on a sale of cattle. It is apparent from the record that in any business venture, where a loss might accrue to him, Sanford would worry and become nervous and ill. In 1921 he had a sale of the personal property on the farm. He worried, and speculated on what the sale would bring, and agreed to sell the proceeds of the sale for $2,100 to a business associate. He continued to worry and on the day of the sale was ill. The result of the sale proved to be a profit of $474 above the purchase price agreed upon and expenses. Realizing that by selling he had made a profit for his business associate, Sanford ignored the latter, who did not take advantage of the transaction, for the reason, as he expressed it, Sanford would be "down and out," would become ill worrying about the loss. This associate observed that Sanford always feared a loss and would worry about it when they would purchase cattle together. After the sale, Sanford moved to Stapleton. He lived at Clarence's home and other places and in 1929 married Lena Schrader, with whom he had boarded just prior

to his marriage. He conducted an elevator which was not a profitable venture.

Sanford had a very deep affection for Carl, upon whom he looked more as a son, and endeavored to take care of him. He loaned Carl various sums of money at different times, and Carl repaid some of the money. Sanford purchased $8,200 worth of government bonds and had them made payable jointly to Carl and himself; some to be paid to Carl at Sanford's death. On one occasion he purchased $1,500 worth of bonds, and they were sent to Carl, who did not know who the sender was. Later, Sanford told him that he had sent them. After Sanford's marriage, Carl, his wife, and Sanford and his wife became very close friends, visited back and forth and had a great deal in common. This friendship continued until Sanford's death.

Clarence moved to Stapleton in January, 1923. At that time Sanford came to Clarence's home and stayed with him for a while. Clarence and he talked at various times about the farm and old times, and on February 2, 1923, in the presence of Clarence's wife, Sanford was figuring and wrote out a check for $7,000 and handed it to Clarence, saying: "I've always helped Carl;" "I've never done nothing for you, and you folks have always taken care of me when I was sick;" "You never got anything out of the estate;" "I want you to have this." Clarence took the check and thanked Sanford, but never cashed it, although it would have cleared without difficulty, giving, in substance, as his reason that Sanford was sick and growing worse, was then involved in a land deal, and that this check would deplete Sanford's account in the bank and interfere with his business. Clarence testified that Sanford was nervous, sick and could not sleep; that he called Doctor Carr, who told him that Sanford's condition was mental more than physical. This was corroborated by Dr. C. E. Kennon, who examined Sanford at Clarence's home in the winter of 1923. The doctor testified that Sanford did not talk naturally, seemed a little demented, and that his mental condition was not at that time normal, due to toxemia.

Whenever Sanford was ill Carl would be sent for. He had a faculty of rebuilding Sanford's morale and inducing him to throw off his burdens. After such illness, Sanford took trips which contributed materially to his betterment. There are isolated instances depicted by the record where Sanford made some remarks to the effect that Clarence believed he, Sanford, had taken things from the father's estate and, therefore, Clarence need not expect anything from him. There was one remark attributed to Clarence with reference to Sanford's marriage, to the effect that Sanford should make up his own mind and not rely on Carl as to when his wedding should take place, and the religious question was slightly involved, but these incidents apparently did not affect the relationship between Clarence and Sanford, except that after the latter's marriage there was very little visiting between the two families, while the relationship existing between Carl and his wife and Sanford and his wife was very close.

The record further discloses that Sanford was eccentric in some degree, was rather close in some of his business relations, and at times refused to loan Carl money, but after thinking the matter over he would generally make the loan. There is testimony to the effect that, as Sanford failed in health and grew older, he would forget about the collection of his accounts, such as interest and rents, and the amounts, and, upon being informed that an amount was wrong, would correct it; that his condition was gradually growing worse in this respect, and that he looked badly, especially during the last few years of his life. Prior to the summer of 1938 Sanford was worried about what was known as the Polzkill deal. This involved a mortgage given by Carl Polzkill to Sanford in the amount of $1,800. Carl Polzkill would not pay the mortgage or interest thereon, so Carl Bowman took over the deal for his brother by increasing the loan and having the mortgage made to himself for $2,800. In doing this he used $1,005 of Sanford's money.

Sanford told some of his close friends and neighbors that his health was not good and that he was losing his mind.

These neighbors and friends testified that he seemed to be sick, weak, feeble, distressed, tired and nervous. It is true that Carl was the recipient of many favors from Sanford during the course of Sanford's life; especially with reference to money matters. Sanford relied on Carl and confided in him. Carl attended to a great deal of Sanford's business, collected rents and interest for him, obtained a loan for him on one occasion and was thoroughly acquainted with Sanford's business, and the older Sanford grew the more he relied on Carl. When Sanford would become ill, his wife would call for Carl to come and encourage him.

Clarence moved to Oregon in 1938 where he lived on his land. The relationship between him and Sanford continued to be friendly, and Sanford sent Christmas cards and other favors to Clarence's family and loaned money to his children which was repaid in part. When Clarence would return to Nebraska, he would visit with Sanford and was at Sanford's house for dinner on one of such visits. Carl sent for Clarence during Sanford's last illness, and Clarence went to the hospital to see his brother, telling him he had come to Nebraska to see him. Thereafter Carl told Clarence not to tell Sanford he had come especially to see him, and Clarence informed him that he had already talked to his brother about this matter. Carl then told Clarence about the will and how Sanford had left his property, saying "if you don't get smart I'll give you a little." While Sanford was in the hospital, Clarence would visit him two or three times a day. On one of these occasions Sanford told Clarence: "When I get well I'm going to do different." Clarence did not ask him what he meant by this statement. Carl was present, and Sanford made the same statement on one or more other occasions.

The foregoing constitutes the substance of the material evidence in the record. The trial court properly placed the burden of establishing undue influence on the contestant who asserted it.

In an action to set aside a will because of improper or undue influence exerted upon the testator, the burden of

proof is upon the contestant. *In re Estate of Hagan,* p. 459, *post,* 9 N. W. (2d) 794, and cases cited therein on this proposition. We adopt the rule with reference to the burden of proof as announced ·above and the reasoning in support thereof.

"It has been held impossible to describe with precision and exactness what is undue influence, and what the quality and the extent of the power of one mind over another must be to make it undue." 68 C. J. 743.

"Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own." *In re Estate of Stuckey,* 105 Neb. 641, 181 N. W. 564. And in 28 R. C. L. 142, sec. 97, it was said that undue influence can rarely be established by direct proof, and, accordingly, it is the rule that undue influence may be proved by indirect evidence and by proof of facts from which it may be inferred.

"In making his proof a contestant is not limited to the bare facts that he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts." *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, 22 L. R. A. n. s. 1024.

In *In re Estate of Noren, supra,* this court said: "Undue influence * * * is usually surrounded by all possible secrecy. It is almost always difficult to prove by direct and positive proof. It is largely a matter of inferences from facts and circumstances surrounding the testator, his life, character, and mental condition, as shown by the evidence, and the opportunity afforded designing persons for the exercise of improper control."

Where the will contains unjust or unnatural provisions, it demands close judicial scrutiny. The declarations of testator are admissible to show his state of mind and consequent susceptibility to undue influence. The fact that a will is unnatural, unreasonable or unjust in the distribution of property is a circumstance to be considered by the jury in connection with other evidence bearing on the question

whether the will is the result of undue influence. 28 R. C. L. 148, sec. 103, and note 12. In this connection, the inequality of distribution, the unreasonableness of the will and its unnaturalness are considered in determining undue influence where the will is grossly unreasonable and plainly inconsistent with testator's duty to family. 28 R. C. L. 148, sec. 103.

While it is a generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, the relationship between the two may be considered with all other facts and circumstances in the case. This is in connection with all the other evidence and circumstances as disclosed by the authorities heretofore cited.

Essential elements of undue influence are: (1) Susceptible person; (2) another's opportunity to exert it; (3) disposition to do so for improper purpose, and (4) result clearly showing effect of such influence. *Will of Schaefer*, 207 Wis. 404, 241 N. W. 382.

In view of the authorities heretofore cited and considering the evidence in connection therewith, we conclude that the testator was susceptible to undue influence. He was failing in health for the last few years of his life; he had confided in and leaned more upon Carl; he was 70 years of age; he had loaned Carl large sums of money, had made out bonds for the benefit of Carl, and on the day that he made his will he and his wife had gone to Carl's. On the morning he left he asked for a lawyer, said he was going to make a will, and went to a lawyer recommended by Carl. Obviously, there had been some talk about the will. Some of the witnesses testified that the testator told them Carl was urging him to make a will. Carl knew that his brother was going to make a will that morning, told his wife the same afternoon that a will had been made, and Lena referred to it as "the will."

The opportunity to exert undue influence was present. Carl was able to "jolly" Sanford and build his morale when

he had sick spells. Carl and Sanford married sisters; their family relationship was very close, while the relations with the contestant were not close, and, in fact, Sanford and his wife for a period of 12 years were in contestant's house but once. True, there was some small amount of visiting, but not such as one would expect as disclosed by the circumstances, because during the early part of their lives Sanford and the contestant helped each other, endured some hardships, and the contestant and his family cared for and nursed Sanford during his extreme illness on at least two occasions, and befriended him as a brother would and should do. All of this was apparently forgotten after Sanford's marriage.

Was there a disposition on the part of Carl and Lena to exercise undue influence? From the foregoing statements and the evidence, there was a disposition to exert undue influence. We have heretofore mentioned the relationship of the parties. There was apparently no hesitancy on the part of Carl, who had much insight into Sanford's business, in accepting property in his name, as evidenced by the bonds and the loans made to him. After he learned the contents of the will on Christmas Day, 1940, he said nothing about it until the conversation he had with the contestant after Sanford's death. Lena married Sanford when he was 61 years of age. He purchased a home for her. She had little means. The circumstances are significant that not much contact thereafter was had with Clarence and his family, but there developed the close relationship between Lena, her sister, Carl and Sanford. Carl knew the contents of the strong box; he transacted business; Lena knew all of these circumstances.

Was there a result clearly appearing to be the effect of the supposed undue influence? This question must be answered in the affirmative. The basis of the testator's wealth was the estates of his parents which were never administered. Sanford had the use and benefit of the same for a period of 40 years. He had adequately taken care of Carl. Under the circumstances, the will is grossly unreasonable

in ignoring Clarence, especially when considered with the fact that on February 2, 1923, Sanford gave Clarence a check for $7,000, recognizing that Clarence was entitled to this much of the estate, or at least recognizing that Clarence had an interest in their parents' estates. Clarence did not cash the check; he knew the frailty of testator's mind, his general disposition, the fact that he worried and that he was then engaged in a business deal. There is further evidence that the testator at times realized that Clarence was entitled to some of the benefits from their parents' estates. During his last illness he remarked that if he recovered he would do differently. It is unnatural and grossly unreasonable that a brother so considerate of the testator's well-being should be absolutely forgotten and ignored.

We conclude from all the evidence that the elements that go to make up undue influence were present in this case, and that the question was properly presented to the jury.

Generally speaking, where the record in a law action contains evidence to support a proposition, and reasonable minds might differ as to whether the proposition is supported thereby, the question is one for the jury. Where, as in this case, competent evidence relating to undue influence is conflicting, the issues of fact are questions for the jury, and it is not error for the court to submit such issues. *In re Estate of Noren, supra.*

A will contest is not triable *de novo* in the supreme court. The practice supported by the weight of authority in this state is that a will contest, where the evidence is conflicting, is triable to a jury and, therefore, upon review in the supreme court is not triable *de novo*. *In re Estate of Kubat,* 109 Neb. 671, 192 N. W. 202. See, also, *In re Estate of Hagan, supra,* and cases cited therein on this proposition.

For the reasons given in this opinion the judgment of the trial court is affirmed.

AFFIRMED.