IN RE ESTATE OF FRED GEORGE.
W. O. COLLETT, EXECUTOR, ET AL., APPELLANTS, V. JENNIE
GEORGE FREDERIKSEN ET AL., APPELLEES.
15 N. W. 2d 80

FILED JUNE 30, 1944. No. 31720.

*Clarence A. Davis, Paul E. Boslaugh, William W. Redmond, M. M. Maupin, M. C. Murphy* and *Zelma Derry,* for appellants.

*Hoagland, Carr & Hoagland, F. Reed Poore* and *I. D. Beynon, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL and WENKE, JJ.

MESSMORE, J.

This is a will contest. The executor named in the last will and testament of Fred George, a bachelor, who departed this life May 24, 1942, leaving an estate valued at $125,-000, consisting of more than 6,000 acres of land, other real estate, personal property, consisting of livestock, farm and ranch equipment, and money and securities, offered for probate the will dated March 27, 1935, together with a codicil dated March 16, 1938, and a second codicil dated September 2, 1941. The beneficiaries, devisees and legatees of the will and codicils are nieces and a nephew, children of a deceased sister, Tom Bickley, an employee of the testator, and Anna Harris Snyder, a half sister of Tom Bickley, who had been employed by the testator. Objections to probate were filed by Jennie George Frederiksen, a sister, and as next friend of Emma George, an insane sister, numerous nieces and nephews. Hearing was had, the will and codicils were admitted to probate, and contestants appealed to the district court.

The will, after providing for payment of administering

the estate, expenses of last illness and funeral expenses, bequeathed to Tom Bickley all the personal property, except money on hand and securities, a life estate in certain lands, consisting of approximately 4,417 acres, title in fee simple to some lots in the town of Brady, and $2,000 in cash. Bickley was restricted in that he had no power or authority to sell, mortgage, encumber, or subject this life estate in and to the real estate devised to debt or obligation. Three nieces, Elsie, Goldie and Esther Rosentrator, were each bequeathed $1,000 in cash, Anna Harris Snyder $1,000 and an additional $1,000 conditionally. The will devised to a nephew, George Rosentrator, three sections of land, to a niece, Louise Rosentrator Dillon, a half-section of land, and to the niece, Rosie Rosentrator, the bank building in Brady. The same nieces and nephew, together with Anna Harris Snyder, were bequeathed, share and share alike, the fee simple title to the real estate in which Tom Bickley was devised a life estate, and also shares in the residue of the estate. The testator declared that he had a large number of other relatives, brothers, sisters, nieces and nephews, for whom he made no provision, and directed that they take no part of his estate; that he had not forgotten or overlooked any one, either relative or otherwise, to whom he desired to give his property or estate.

The codicil of March 16, 1938, provided that on the testator's death Bickley should not be disturbed in the possession of the property given him by the terms of the will; that, in the event any beneficiary named in the will contest the same, such person shall take nothing. The codicil confirmed, ratified and approved the will. The codicil of September 2, 1941, provided that, due to the fact that two attesting witnesses of the former codicil have since died, the second codicil was made to confirm, ratify and approve the will dated March 27, 1935, and codicil thereto dated March 16, 1938.

The contestants objected on two grounds, both of which were raised on appeal in the district court, viz.: (1) That the testator lacked testamentary capacity, and (2) that the

will and codicils were procured by the exercise of undue influence over the testator. The jury returned a verdict for the contestants. In response to special interrogatories, the jury replied that they found that the testator possessed testamentary capacity, but the will and codicils were found to be due to undue influence exercised on the testator. Motion for a new trial was denied, and judgment entered on the vedict. It is from this verdict and judgment that proponents appeal.

The proponents contend that the court erred in giving instruction No. 4, which reads:

"If you find from a preponderance of the evidence in this case that Tom Bickley is the chief beneficiary under said will and codicils thereto and that he occupied a position of trust and confidence with the testator Fred George and that the provisions of said will and codicils are unjust and inequitable, then the law would presume that said instruments were the result of undue influence on the part of said Tom Bickley and the burden would be upon him to furnish you with a reasonable explanation of the provisions of said will and the codicils thereto. But unless you find from the evidence that Tom Bickley is the chief beneficiary under said will and that he occupied a position of trust and confidence with the testator and that the provisions of said will are inequitable and unjust, or if you find that he has furnished you with a reasonable explanation of the provisions of said will and the codicils thereto, then the burden of proof on the issue of whether or not the making and signing of said will was the result of undue influence exercised upon said Fred George is upon the contestants.

"Before you may find that the making and signing of said will and codicils was the result of undue influence upon said Fred George you must be satisfied that such making and signing of said instruments has been shown by a preponderance of all the evidence to have been occasioned by undue influence exercised upon said Fred George by Tom Bickley. * * * ."

Proponents contend that the instruction required the

proponent Bickley to assume the burden of proof that under the law could not be rightfully placed upon him, and that it was error for the court in this case to advise the jury that the burden of proof on the issue of undue influence was upon the proponent Bickley under any circumstances and conditions. The instruction provides for the shifting of the burden of proof under certain conditions to be determined by the evidence, and leaves the task to the jury to discern whether or not the burden of proof is on the contestants at one time and on the proponent Bickley at another time. This instruction is in keeping with the exception to the general rule on the burden of proof where undue influence is involved and in accord with the case of *Wixson v. Nebraska Conference Assn.*, 122 Neb. 771, 241 N. W. 532. In the *Wixson* case the court approved an instruction which placed on the jury the burden of determining where the burden of proof rested.

This court in *In re Estate of Hagan*, 143 Neb. 459, 9 N. W. 2d 794, stated: "In so far as will contests are concerned where the ground of the contest is undue influence, the exception to the general rule that the party charging undue influence assumes the burden of proving it, as contained in *Wixson v. Nebraska Conference Ass'n, supra*, is rejected and overruled and the general rule as set forth in *In re Estate of Wilson, supra* (114 Neb. 593, 208 N. W. 961), is reannounced without exception as follows: 'Where it is alleged that the execution of a will was procured by undue influence, the burden is upon the party alleging it to establish that the testator was induced by improper means to dispose of his property differently from what he intended.'" See third syllabus point in *Seebrock v. Fedawa*, 30 Neb. 424, 46 N. W. 650. *In re Estate of Hagan, supra*, on the burden of proof in will contests, where undue influence is involved, was reaffirmed in *In re Estate of Bowman*, 143 Neb. 440, 9 N. W. 2d 801.

The proponents tendered two instructions on the burden of proof, in accordance with the general rule, as announced in the cases heretofore cited. See, also, *Boggs v. Boggs*, 62

Neb. 274, 87 N. W. 39; *In re Estate of Dovey,* 101 Neb. 11, 162 N. W. 134; *In re Estate of Fenstermacher,* 102 Neb. 560, 168 N. W. 101; *In re Estate of Bayer,* 119 Neb. 191, 227 N. W. 928. Instruction No. 4 is clearly violative of the rules on the burden of proof in this class of cases. The burden of proof, in its proper sense, rests, as to each issue, on the party having the burden of such issue. *Pierce v. Miller,* 107 Neb. 851, 187 N. W. 105; *Moore v. Williams,* 111 Neb. 342, 196 N. W. 695; *In re Estate of Hagan, supra.* The question of where the burden of proof shall rest shall be determined from the pleadings.

In 31 C. J. S. 709, sec. 104, it is said: "The test for determining which party has the affirmative, and therefore the burden of establishing a case, is found in the result of an inquiry as to which party would be successful if no evidence at all were given, the burden being, of course, on the adverse party." We conclude that instruction No. 4 is prejudicially erroneous.

Instruction No. 8 is attacked. While it contained, in the main, the four elements to be proved where undue influence is charged, viz.: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; (4) that the result appears to be the effect of such influence (*In re Estate of Hagan, supra,* and *In re Estate of Bowman, supra*), the instruction incorporated certain other matters shown by the evidence that the jury might take into consideration. The vice of an instruction of this kind is that it indicates to the jury certain facts which might leave the impression with the jury that such facts, having been stressed, must be taken to be true, or are conclusive. Under the decisions, all facts, circumstances and legitimate inferences may be considered. In the event of retrial this instruction, in all probability, will be modified to meet the requirements of proof, as announced in *In re Estate of Hagan, supra,* and *In re Estate of Bowman, supra.*

While there is some effort made to connect the scrivener, who drew the will and codicils, with taking an active part

in building up evidence of the testamentary capacity of the testator through his intimate friendship with the family, there is nothing to disclose that the scrivener acted otherwise than he should have acted in the preparation of the instruments, and suffice it to say that his acts were such as a well-informed attorney would have performed under like or similar circumstances, and in keeping with legal ethics.

The testator was born in Crete, Nebraska, on April 8, 1872. He was one of a large family of brothers and sisters, and, in fact, as the eldest son, under a custom existing in the old country and within the family, would have charge of and control over, in the event of the loss of his parents, the estate, to care and provide for his brothers and sisters. In 1886, when the testator was 14 years of age, he removed to what is known as Brady Island, in Lincoln county. His father was a farmer and stockman, owning some considerable land and stock. There the testator worked for his father for a period of years. In 1900 the father made a partial division and distribution of his estate among his children. The testator at that time received the home place which was well improved, and twice as much personal property as the other children. In dispute is the fact that after this division the father continued to own a large herd of cattle, some horses and hogs, and continued in the livestock business with the testator on the home place. It is claimed that testator received five sections of pasture land in addition to the home place, and in excess of the land given to the other children. In this connection, the proponents offered to put in evidence the records, disclosing the transfers of land, which was objected to, due to a stipulation; the court felt that the matter might be confusing and sustained the objection. This evidence should have been received; it would have given the proponents an opportunity to dispute the statements, with reference to the division of land, as testified to by witnesses for the contestants.

In 1909 the testator's father died, and the testator handled his estate and made a proper accounting for all of the items and proper distribution as directed by the county court.

Throughout his lifetime testator performed many services of a civic nature. He was a member of the school board and, as such, took an interest in school activities, both scholastic and athletic, using his automobile for conveying the school board members to different functions and accompanying them. He served as a member of the taxpayers' committee in Lincoln county, to assist in tax matters. He bought the majority stock in a bank in Brady, and purchased the bank building in 1937. Contention is made that he bought the bank stock and the bank building for more than they were worth. There was an offer to show the book value of the stock which was denied admission in evidence. It would have been proper to have admitted this evidence. The testator was a member of a church and served on its board of trustees. He was a member of the Odd Fellows Lodge and held the highest office in the local lodge at one time. He belonged to the stockmen's organization, attended their conventions and meetings. He was on the reconciliation board during the depression. His advice on business matters was sought, and he was described by an array of witnesses as being a man of sound mind, good business judgment and not easily influenced. The record is replete with circumstances, as heretofore set out, but it would unnecessarily lengthen this opinion to detail them further. We deem the evidence sufficient to disclose that the testator possessed testamentary capacity to make the will and codicils thereto.

While the evidence on testamentary capacity and undue influence in cases of this kind are closely related, undue influence may be, and oftentimes is, separate and distinct from the question of testamentary capacity. In discussing whether or not undue influence is exerted, the facts and circumstances of each individual case must be taken into consideration and applied to the law governing this class of cases.

"It has been held impossible to describe with precision and exactness what is undue influence, and what the quality and the extent of the power of one mind over another must

be to make it undue." 68 C. J. 743. "Undue influence, in order to invalidate a will, must be of such character as to destroy the free agency of the testator and substitute another person's will for his own." *In re Estate of Stuckey,* 105 Neb. 641, 181 N. W. 564.

In 28 R. C. L. 142, sec. 97, it was said that undue influence can rarely be established by direct proof, and, accordingly, it is the rule that undue influence may be proved by indirect evidence and by proof of facts from which it may be inferred. And in *Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, we find this language: "In making his proof a contestant is not limited to the bare facts which he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts." See *In re Estate of Bowman, supra.*

In *In re Estate of Noren,* 119 Neb. 653, 230 N. W. 495, this court said: "Undue influence * * * is usually surrounded by all possible secrecy. It is almost always difficult to prove by direct and positive proof. It is largely a matter of inferences from facts and circumstances surrounding the testator, his life, character, and mental condition, as shown by the evidence, and the opportunity afforded designing persons for the exercise of improper control."

In 1911 Tom Bickley, a native of South Carolina, and a man of two years of common school education, came to work for the testator on his ranch. He worked intermittently, and in 1918 worked steadily for the testator until the latter's death. This latter employment was interrupted only for a short period of time, due to failure to make proper arrangements for pay for services of both Tom's mother and himself. Shortly thereafter an adjustment was made and the mother worked for a period of time as housekeeper until her health failed her, after which she returned for such time as her services were required. Tom's sister, now Anna Harris Snyder, worked on the ranch as a young girl in the field and in the home, doing washing and other household duties. She continued this employment until her marriage, and at different times subsequent thereto would help

with the work. Tom performed the ordinary duties incident to farming and ranching, and, in addition, on occasions did some cooking and washing and shaved the testator when he was ill and at other times. Tom received an average wage from and after 1918 of $45 a month and was privileged to have a few cattle and chickens of his own. He and the testator lived together until the latter's death.

The contestants' evidence on the question of undue influence in the following general particulars discloses that there was insanity in the testator's family. Many occasions and incidents are testified to, showing that the testator had a dislike for other members of the family; that he was moody, given to temper tantrums, and would strike inanimate objects, and that some of these spells would last for a period of three weeks. At different times he had much trouble with other members of the family, and his dislike would reach an abusive stage, toward his brothers and sisters. This feeling continued throughout testator's lifetime. He formed a hatred for his brother Henry that lasted from and after 1920 to the time of testator's death. This developed over disputes about fences and fence lines, straying of cattle and other matters. Just before he died he refused to see Henry. During the period of time that testator and Tom Bickley lived on the ranch together, Bickley would make disparaging remarks about Henry, and when he would make such remarks in the presence of the testator it would incite in testator a visible showing of dislike and hatred of Henry. These acts on the part of Bickley were continuous.

Psychiatrists, as expert witnesses, testified that the testator was afflicted with dementia præcox of the paranoid type and possessed the symptoms incident to that form of insanity,—in brief: That he was suspicious, believed he was being persecuted by those who were close to him, formed a hatred and dislike for those closest to him, the family, and was susceptible to the influence of those outside of the family, as against the family. This being true, the continuous derogatory remarks of Bickley added fuel to the hatred that testator bore toward Henry. Bickley was subservient

to the desires of the testator. In this manner he could get along with testator well, and this made the latter a good listener to the remarks and insinuations by Bickley, he being aware of the testator's weakness in this particular. Other occasions and incidents appear in the record, such as Bickley claiming on one occasion that Henry ran him off the highway, telling the testator the facts, while a man working on the premises, who saw both Henry and Bickley on the road, said that they were nearly a half a mile apart; an occasion when Henry's cattle strayed onto testator's land, and Bickley met Henry in a downtown store, and told him about it and there was some argument; Bickley going to the hospital when testator was there and inducing him to write to a bank with reference to Henry's cattle; an occasion when a Yale lock was placed on a door leading upstairs in testator's house, and when Bickley explained, using profanity, that testator had a brother who liked to "pry around" and they had missed some things. Other occasions, together with incidents developed in the family history, are in the record, which we deem unnecessary to state.

We have set out such portions of contestants' testimony to disclose that there is a sufficient controverted issue of fact on the question of undue influence to submit the case to the jury on such matter. All of the foregoing and other items appearing in the record are controverted by the proponents' testimony. The question is one for the jury.

The proponents contend that, where the evidence discloses that certain beneficiaries under the will and codicils have not been charged with or shown to have exerted undue influence, only that part of the will where the person asserts undue influence, if such be the fact, shall be denied probate and all other beneficiaries, legatees or devisees under the will will not be disturbed, in so far as the will and codicils relate to them, citing *In re Estate of Kajewski,* 134 Neb. 485, 279 N. W. 185, wherein it was said (p. 488): "Upon the question of undue influence, it had been held by this court that the will may be invalid as to one exerting the undue influence, and valid as to one legatee for whom

no influence was present. Where a will contains a bequest due to undue influence, it may stand as to other bequests not so procured. *In re Estate of Koller*, 116 Neb. 764, 219 N. W. 4. A careful annotator states: 'The authorities, with but few exceptions, support the general proposition that parts of a will may be held valid and enforceable, notwithstanding the fact that other parts have been affected by undue influence and are invalid; provided, however, that the parts so affected are separable, so that the will remains complete and intelligible in itself.' 69 A. L. R. 1129." The test is whether the parts so affected are separable, so that the will remains complete and intelligible.

In *Estate of Van Wyck*, 185 Cal. 49, 196 Pac. 50, it was said in the opinion (p. 62) : "The real question presented where a will contains both valid and invalid provisions is whether the two are so parts of a single plan or scheme or otherwise so dependent one upon the other that by avoiding the invalid provisions and allowing the valid to stand there will result a disposition of the estate so different from what the testator contemplated or so unreasonable that it must be presumed that the testator would not have made the valid provisions if he had been aware of the invalidity of the others."

In *Walker v. Irby*, 238 S. W. (Tex. Com. App.) 884, it was held: "The general rule that, where a part of a will is invalid, the valid bequests should be sustained, has its limitations; and when the rule will defeat the testator's intent, and interfere with the general scheme of distribution, or work an injustice to other heirs, it should not be applied."

It is not a question as to whether the Rosentrator children or Anna Harris Snyder exercised undue influence. The question is whether or not Bickley exerted undue influence on the testator and was the controlling cause of the execution of the will and codicils. Take from the will the bequests to Bickley, it would defeat the testator's intent and interfere with the general scheme of distribution. This will comes within the classification of wills wherein the rule as contended for by proponents should not be applied, if undue influence of Bickley be properly proved.

The proponents predicate error on the admissibility of certain evidence. In view of our holding, we deem it unnecessary to discuss these matters any further than they have been discussed in the opinion, except to say that in a retrial certain evidence given by the witness, Jennie George Frederiksen, should be kept within more orderly bounds and restricted to responses to the questions propounded. We recognized the difficulty of this situation.

We deem it unnecessary to discuss the other assignments of error raised.

For the reasons given in this opinion, the cause is reversed and remanded for trial on the question of undue influence.

REVERSED.

Supplemental opinion filed in this case appears p. 915, *post*.