IN RE ESTATE OF MARY LORETTA POLLY, DECEASED.
MABLE V. COOK, APPELLANT, V. DONNA KETCHMARK ET AL.,
APPELLEES.

117 N. W. 2d 375

Filed October 12, 1962. No. 35215.

Harold E. Connors and Ernest A. Ondracek, for appellant.

E. L. Vogeltanz, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This action arose as a result of Donna Ketchmark, Julia Warwick, Roy Hughes, Walter Hughes, Frank Hughes, Veda Connor, John Hughes, Alice Noski, Irene M. Lewis, Reuben Hughes, Ray Hughes, Tom Hughes, Verna Peterson, and Carlton Hamilton, nephews and nieces of the deceased, and Mr. and Mrs. Boyd McKenzie, objecting to the allowance for probate of the last will of Mary Loretta Polly, deceased. The trial court for Greeley County submitted to a jury the issue of whether or not the will was the result of undue influence exercised over the deceased by Mable V. Cook, a niece of the testatrix. The jury found that the last will of Mary Loretta Polly, dated October 16, 1959, was not a valid last will and was null and void. The proponent then filed a motion asking the court to render judgment notwithstanding the verdict. The proponent also filed a

motion for a new trial. Both of the above motions were overruled. The proponent perfected appeal to this court.

. At the close of the contestants' evidence, the proponent moved the court to dismiss the objections of the contestants for the reason that the evidence was insufficient to go to the jury on the issues raised by the contestants' objections. The proponent made the same motion at the close of the case. At the close of the proponent's evidence, the contestants moved the court to declare that the last will of the testatrix be held invalid for the reason that the proponent failed to make a prima facie case as to the validity of the will. The motions made by the proponent and the contestants were overruled.

The proponent's assignments of error may be summarized as follows: That the verdict is contrary to the law and not sustained by the evidence, and that the trial court erred in giving instruction No. 12 on its own motion to the jury.

"In a will contest upon the ground of undue influence the burden is upon the contestant to prove by a preponderance of the evidence (1) that testator was subject to undue influence; (2) that there was opportunity to exercise undue influence; (3) that there was a disposition to exercise undue influence for an improper purpose; and (4) that the result was clearly the effect of undue influence." Benge v. Sutton, 169 Neb. 769, 100 N. W. 2d 857.

"In a will contest, where undue influence is alleged, that question should be submitted to the jury when the facts and circumstances proved, together with inferences fairly deducible therefrom, are such that reasonable minds might conclude that the will was not the free and voluntary act of testator, but the result of undue influence exercised upon him." In re Estate of Strelow, on rehearing, 120 Neb. 242, 233 N. W. 889.

"Undue influence is usually surrounded by all possible secrecy. It is almost always difficult to prove by

direct and positive proof. It is largely a matter of inferences from facts and circumstances surrounding the testator, his life, character, mental condition, as shown by the evidence, and opportunity afforded designing persons for the exercise of improper control." In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80.

"In making proof, a contestant is not limited to the bare facts that he may be able to adduce, but he is entitled to the benefit of all inferences which may be legitimately derived from established facts. * * * The declarations of a testator are admissible to show his state of mind and consequent susceptibility to undue influence. * * * While it is a generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, the relationship between the two may be considered with all of the other facts and circumstances in the case in determining undue influence." In re Estate of Bowman, 143 Neb. 440, 9 N. W. 2d 801.

The fact that a will is unnatural or unreasonable in the distribution of property is a circumstance to be considered by the jury in connection with other evidence bearing on the question of whether the will is the result of undue influence. See, In re Estate of Bowman, *supra;* In re Estate of Bainbridge, 151 Neb. 142, 36 N. W. 2d 625.

It is permissible not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements requisite to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the issue of undue influence be submitted to and determined

by a jury.  See In re Estate of Bainbridge, *supra.*

For convenience we will refer to Mary Loretta Polly as Mrs. Polly and to Mrs. Mable V. Cook as Mrs. Cook.

It will be noted by the evidence that Mrs. Polly at times is referred to as Aunt Rett.

Mrs. Polly was a widow, 87 years of age, and a resident of Scottsbluff.  She had a son, Harry Graham, who contributed to her support.  On July 26, 1959, her son died.  Mrs. Polly inherited from his estate.  Mrs. Polly continued to live in Scottsbluff until September 1959.  In that month she fell, and was taken to a hospital.  While in the hospital she wrote to Mrs. Cook, a niece who lived at Greeley, and to Emmett Hughes, a nephew who lived at Burwell, asking them to come and see her.  It appears from the record that Mrs. Polly had several nephews and nieces whom she had not seen for a number of years.  Mrs. Cook testified that she had corresponded with Mrs. Polly for about 10 years.  Mrs. Cook asked her son to take her to Scottsbluff on September 18, 1959.  Mrs. Cook, Emmett Hughes, and his wife, Monia Hughes, left for Scottsbluff with Mrs. Cook's son Pat.  They arrived early in the morning.  Emmett Hughes and Pat Cook returned home, and Mrs. Cook and Mrs. Hughes remained in Scottsbluff.  They went to the hospital to see Mrs. Polly and were informed that she could leave the hospital if she had someone to take care of her.  She was released from the hospital on September 20, 1959, and returned to her apartment in Scottsbluff with Mrs. Cook and Mrs. Hughes.

Prior to the arrival of Mrs. Cook and Mrs. Hughes, Mrs. Polly had consulted an attorney with reference to making a will and about the inheritance she had received from her son.  On September 22, 1959, Mrs. Polly requested her attorney to come to her apartment and prepare a will.  The same evening the attorney and his wife returned to the apartment and the will was signed by Mrs. Polly and witnessed by the attorney and his wife as attesting witnesses.  This will provided in sub-

stance that one-tenth of the estate was bequeathed to Emmett Hughes; an undivided one-tenth was bequeathed to Mrs. Cook; an undivided one-fifth was bequeathed to the sons and daughters of Mrs. Polly's sister Nora Hughes who were living at the time of the death of the testatrix; an undivided one-fifth to the sons and daughters of Mrs. Polly's sister Sadie Hughes who were living at the time of her death; an undivided one-fifth to the sons and daughters of her brother Mark Hamilton who were living at the time of her death; and an undivided one-fifth of her estate to her good friends Mr. and Mrs. Boyd McKenzie of Scotts Bluff County or the survivor of them. The will nominated and appointed Boyd McKenzie as her executor. This will was executed on September 22, 1959.

Mrs. Polly was not entirely satisfied with the will and called her attorney for the purpose of making some changes in it. The next day, September 23, 1959, Mrs. Polly, Mrs. Hughes, and Mrs. Cook left by train for Grand Island where they stayed overnight. The next day Mrs. Cook and Mrs. Polly proceeded to Greeley and Mrs. Hughes went to her home at Burwell.

A few days later Mrs. Polly requested that a lawyer come to see her at Mrs. Cook's home. The lawyer complied with this request. He and Mrs. Polly went into a little apartment that Mrs. Polly was occupying. As a result of a conversation with the lawyer, Mrs. Cook was appointed conservator of the property belonging to Mrs. Polly on September 30, 1959.

Thereafter, in the lawyer's office another will was drawn. The lawyer and his wife signed this will as attesting witnesses, and this is the will in controversy here. This will provides in substance that Emmett Hughes receive an undivided one-tenth of the property of the testatrix; $100 is bequeathed to James Booth; and all the rest and residue of the property, real, personal, and mixed, is bequeathed to Mable Cook, a daughter of a deceased sister of the testatrix. The will also stated

that the testatrix well realized that she had a living sister and numerous other relatives, but it was her wish that none of them should take under this will, and that the testatrix had not forgotten them but intentionally omitted them from any share of her estate. This will was prepared and executed on October 16, 1959. This will, which was signed "Mrs. Retta Polly" for the reason that Mrs. Polly said she signed her name that way, was signed in the lawyer's office. There is testimony by the wife of the attorney who prepared the will to the effect that at the time Mrs. Polly signed this will she was competent to make a will and that she said that was the way she wanted her property disposed of.

Mrs. Cook gave as her opinion that Mrs. Polly was competent to make a will on October 16, 1959, and testified that she never had any discussion with Mrs. Polly about the disposition of her property.

On cross-examination Mrs. Cook said she had not seen her aunt, Mrs. Polly, for possibly 27 years; that she received $100 a month for her aunt's board and room; and that there were other expenses besides that amount for such things as drug and doctor bills.

A doctor testified that he first met Mrs. Polly on November 15, 1959, at Mrs. Cook's home, and consulted with her. At that time Mrs. Polly asked Mrs. Cook to leave, and said she wanted to consult privately with the doctor. The doctor consulted with Mrs. Polly for 10 or 15 minutes. He next saw her on January 5, 1960, at Mrs. Cook's home and talked to her privately for 10 or 15 minutes. He testified that there was nothing unusual about Mrs. Polly's mental condition, that she was normal and physically well preserved for her age, and could carry on her own business.

Another doctor testified by deposition that he had known Mrs. Polly as a patient from May 1960, until her death on January 26, 1961; that he attended her at his office eight times and at the hospital on three occasions; and that her complaints were of a urinary tract dis-

order, lung difficulty, and throat trouble. The doctor gave as his opinion that Mrs. Polly was showing some signs of senility; however, considering her age, he felt she was quite alert, attentive, and capable of forming an opinion. She was independent, and agreed with things she liked and not with things she disliked. The doctor further testified that in November 1960, following physical complications, there was a definite decrease in her mental agility. On cross-examination this witness testified that Mrs. Cook always came to the office with Mrs. Polly; that sometimes Mrs. Cook would come into the office and sometimes not; and that his conversations with Mrs. Polly were mostly about her illness.

Mrs. Emmett Hughes testified that she had corresponded with Mrs. Polly for at least 18 years. As a result of this correspondence, she decided to go to Scottsbluff because she had received mail from Mrs. Polly stating that she was in the hospital and wanted to see Mrs. Hughes. She went to Scottsbluff, visited Mrs. Polly, and stayed, as heretofore set out in the evidence adduced by Mrs. Cook. In October 1959, she visited Mrs. Polly at the Cook home. At that time Mrs. Polly seemed pretty alert, and part of the time she seemed to be satisfied and then acted as though she was not satisfied. She next saw Mrs. Polly on November 8, 1959, because she and her husband had been hearing that Mrs. Polly wanted them to come and see her and take her away from the Cook home. When they saw Mrs. Polly she said she wanted to go, but she wanted to see her banker and her lawyer before she left, and she asked them to come back in the middle of the week and she would be ready to go home with them. This witness further testified that she saw Mrs. Polly in the latter part of December 1959. At that time Mrs. Polly wanted Mrs. Hughes and her husband to take her away, to get her an attorney, and get her out of the Cook home, and she stated that she was a prisoner in her own apartment; that the doors were all locked and she could not go in or

out as she pleased; and that she did not get to see anybody. This witness further testified that she had a conversation with Mrs. Cook who told this witness that Mrs. Polly could not go because Mrs. Cook was her conservator and Mrs. Polly would have to stay with her at all times. The same conversation occurred a couple of times. On one occasion Mrs. Polly put on her coat and got as far as the car to go home with this witness and her husband, but she was not allowed to go. The Cooks moved to Grand Island on September 10, 1960. Mrs. Hughes further testified that they received a letter from Mrs. Cook from Grand Island. They never saw Mrs. Polly in Grand Island, but did talk to her over the telephone. Mrs. Polly wanted to leave there, and Mrs. Hughes said: "Aunt Rett, are you satisfied or do you want us to get you out of there?" She heard another voice on the telephone talking to Mrs. Polly and recognized the voice as that of Mrs. Cook who told Mrs. Polly to say yes she was satisfied. Mrs. Hughes asked Mrs. Polly if she still wanted them to get her'attorney, and Mrs. Cook told Mrs. Polly to say no. Thereafter Mrs. Hughes and her husband were unable to contact Mrs. Polly. They called the hospital and were told that Mrs. Polly had been left at the hospital with instructions that no visitors were to be allowed. Mrs. Hughes further testified that the last time she was at the Cook home to see Mrs. Polly, Mrs. Polly wanted to go home with her and her husband, and tried to get into the car, but Mrs. Cook said she had to iron, and took Mrs. Polly back into the house.

Emmett Hughes testified that Mrs. Polly told him when they were in her apartment that she needed help; that she didn't want to stay with Mrs. Cook any more; that she did not have any money and did not know where her money was; that she wanted to get an attorney; and that she wanted to go home with him. She went to his pickup truck, but Mrs. Cook told her she could not go as they had a date with the doctor the next day. Con-

sequently, this witness did not take Mrs. Polly with him.

Bertha Hamilton testified that she visited Mrs. Polly in May 1960, and Mrs. Polly told this witness that she had made a will in Scottsbluff, and that all of her nephews and nieces and the children of this witness were named in the will. The daughter of this witness was present at the time her mother had a conversation with Mrs. Polly about the execution of the will in Scottsbluff, and corroborated her mother's testimony as above stated.

Donna Ketchmark testified that she had a conversation with Mrs. Polly, her aunt. She was visiting her aunt and wanted to leave, but Mrs. Polly wanted to talk to her. When this witness tried to depart, Mrs. Polly jumped up real quick and said: "Oh, Donna, get me out of here, get me away from these people." This witness said: "Aunt Rett, I don't like to talk about things in here, could you come someplace else, and she said, they won't let me leave the house." Mrs. Polly tried to go home with this witness, but she was not permitted to do so. Mrs. Polly told this witness she wanted a lawyer, and that she wanted to go to Scottsbluff. This witness testified that Mrs. Polly did not seem to know where she was or what house she was in. On one occasion Mrs. Polly went for a walk with this witness. At that time Mrs. Polly said that she was tired of that woman (meaning Mrs. Cook) telling her what to do; that she wanted to go home with this witness; and that she wanted a pickup truck and an attorney. She said: "Oh, Donna, I am afraid it is too late. * * * I am afraid they got my money * * * we have got this money back here and I could have a trust deed because if I signed any papers to get my money back here, I did not know what I was doing, * * *." This witness further testified that she had difficulty in getting Mrs. Polly to return to the Cook home. On another occasion Mrs. Polly objected to being watched by persons around the Cook home, stated she was unable to carry on a conversation in private with

any person, and asked this witness to take her away from the Cook home. She told this witness to drive up the street with her automobile and she would come out. At that time Mrs. Cook did not want Mrs. Polly to come out, but she did. Mr. Cook came out with his cane and ordered this witness off. This witness said she could talk to her aunt on the street, and Mr. Cook said that he would get the law.

Mrs. Cook testified on rebuttal that Mrs. Ketchmark angered her; that she opened the door and Mrs. Ketchmark pushed Mrs. Cook aside and said she wanted to talk to her Aunt Rett; that she used bad language and talked loud; and that Mr. Cook told her that if she didn't use different language she could leave and she said she would leave when she got ready. Mrs. Cook further testified that Mrs. Polly was upset by this incident.

There is evidence on the part of Mr. and Mrs. Boyd McKenzie to the effect that they were acquainted with Mrs. Polly and visited her quite often in Scottsbluff. They took her to and from church and did other favors for her. They were friendly with her and liked her very much. Mrs. Polly called on them several times for certain things that she would like to have done, and they complied with her requests.

As heretofore set out, there is evidence to the effect that Mrs. Polly was not permitted to be with any of her other relatives for any period of time without being observed by Mrs. Cook or members of her family; that on at least two occasions she requested the services of an attorney to help her get out of the Cook home because she was being dominated by Mrs. Cook and was under her control; and that in the spring of 1960, according to the testimony of Mrs. Hamilton and her daughter Mrs. Peterson, Mrs. Polly stated that she had remembered her nephews and nieces in her will, meaning the will that was executed at Scottsbluff. There is evidence that in this will she included two friends of

hers living in Gering who had done many favors for her for a period of 5 or 6 years and who were eliminated from the will here in controversy. There is evidence that Mrs. Cook was practically a stranger to her aunt, Mrs. Polly, and was appointed conservator of her property within a few days after Mrs. Polly arrived at the Cook home, and then 16 days thereafter Mrs. Polly executed the will here in controversy.

The evidence in its entirety was for the jury to consider on the issue of undue influence.

The proponent predicates error on the trial court giving instruction No. 12. This instruction is as follows: "In a will contest, the fact that a will is unnatural, unreasonable or unjust in distribution of testator's property is a circumstance to be considered by jury in connection with other evidence bearing on question whether the will is the result of undue influence."

Under the evidence and the circumstances developed in this case, we conclude that this instruction is not prejudicially erroneous.

The proponent contends that there was abuse of discretion on the part of the trial court when he addressed the jury and then questioned Emmett Hughes. No objections were made by the proponent to the questioning of this witness by the trial court at any time. The questions propounded to this witness were to the effect that he was not contesting this will and had no interest in the outcome of this case. We find no prejudicial error as contended for by the proponent.

The proponent contends that the trial court committed error in not permitting a witness to testify to a conversation when an attorney was present. On direct examination Roy Hughes stated that while he and other of the contestants were in Grand Island with Mrs. Cook and Mrs. Polly at the home of Mrs. Cook's daughter, Mrs. Polly made the remark: "I need help, get me out of here." Mrs. Cook testified on rebuttal that after they were there Mrs. Polly asked to contact her attorney

·and did so by telephone, and as a result her attorney came to Grand Island a day or two later and had a conversation with Mrs. Polly in the presence of Mrs. Cook. The trial court sustained objection to this conversation on the grounds that it was a privileged communication between the client and attorney.

In Short v. Kleppinger, 163 Neb. 729, 81 N. W. 2d 182, the court said: "Communications between attorney and client made in the presence of others do not constitute privileged communications within the meaning of sections 25-1201 and 25-1206, R. R. S. 1943. It is only communications which are confidential that are protected."

The proponent made no offer of proof as to what the conversation was.

This court has held in Bland v. Fox, 172 Neb. 662, 111 N. W. 2d 537: "When on direct examination an objection to a question is interposed by the adverse party and sustained, there must be an offer of proof of the facts sought to be put in evidence by the question in order to present the ruling to this court for review."

We believe the contention of the proponent is without merit. In any event, there was no prejudicial error in the ruling of the trial court on this evidence.

In the light of the evidence and the authorities heretofore cited, we conclude that the judgment of the trial court should be, and is hereby, affirmed.

AFFIRMED.