IN RE ESTATE OF ISAIAH PAISLEY.

SUSIE M. PAISLEY, APPELLEE, V. FRANK PAISLEY ET AL., APPELLANTS.

FILED MARCH 26, 1912. No. 16,642.

1. Wills: UNDUE INFLUENCE: TRIAL: INSTRUCTIONS. The court instructed the jury: "You are instructed that the fact that the proponent, Susie M. Paisley, and the decedent, Isaiah Paisley, were married, is not of itself undue influence. The law encourages marriage between men and women, and the fact alone and of itself that these parties contracted and entered into marriage relations would not raise any presumption whatever of undue influence." Held improper under the evidence in this case, and probably misleading.

2. Instructions numbered 1 and 2, requested by contestants, examined, and held applicable to the facts proved, and that it was prejudicial error to refuse them.

3. Wills: UNDUE INFLUENCE: EVIDENCE. The evidence examined, and held insufficient to sustain the verdict and judgment.

APPEAL from the district court for Polk county. CON-
RAD HOLLENBECK, JUDGE.  *Reversed.*

*Mills, Mills & Beebe* and *E. L. King,* for appellants.

*W. M. Johnston* and *Matt Miller, contra.*

HAMER, J.

On the 28th day of January, 1909, one Isaiah Paisley,
of Polk county, executed a will by which he attempted to
devise and bequeath all of his property, valued at about
$20,000, to the proponent.  It appears that on that day,
and just prior to the execution of the will, he married one
Susie M. Cyphers.  At that time the testator was 66 years
old and was afflicted with certain maladies of which he
died 38 days thereafter.  Miss Cyphers was 40 years of
age, a spinster in good health, and in the full vigor of
middle life.  The testator left surviving him his said wife,
two brothers, three sisters, and certain children of two
deceased brothers.  After the death of the testator the
widow, who was the sole devisee named in the will, pre-
sented it to the county court of Polk county for probate.
The collateral heirs of the deceased contested the will on
the grounds of the mental incapacity of the testator and
undue influence on the part of the widow in procuring its
execution.  E. L. King, Esq., was appointed and appeared
as guardian *ad litem* for the minors, Stewart Paisley and
David Paisley.  The contestants had the judgment in
the county court, which denied probate of the will, and the
proponent appealed to the district court.  On the trial in
the district court of that county the proponent had the
verdict and the judgment, and the contestants have
brought the case to this court.

The appellants contend that the verdict was contrary
to and was not sustained by the evidence.  It appears from
the bill of exceptions, without dispute, that the testator,
a bachelor 66 years of age, was married to the proponent
on the 28th of January, 1909; that immediately following

the marriage ceremony the bridal party, headed by an attorney, went to the office of Johnston & Ball in the town of Osceola, and the testator there executed the will in question, leaving all of his property, both real and personal, to his new wife to the exclusion of all of the contestants who were the natural objects of his bounty. It also appears that about three years before his marriage the testator had experienced a shock of paralysis which destroyed his physical health and to some extent impaired his mental faculties; that at the date of the marriage and for many months before that time Paisley was sorely afflicted with dropsy, rheumatism and other ailments to such an extent as to render him almost helpless; his feet, legs, generative organs and the lower part of his body appear to have been badly swollen so as to render him unable to properly dress his feet; his feet were so swollen that his shoes would not fasten. One of his sisters, Mrs. Lockard, seems to have looked after him and washed him and attended to his clothing. It appears beyond question that he could not, and never did, consummate the marriage relation with the proponent.

It was further shown that Paisley was introduced to the proponent by her sister, Mrs. Woodward, some time in the month of October preceding the marriage, and that from that time until after the ceremony took place Dr. Woodward, the brother-in-law of the proponent, was seen frequently with Paisley; that he often took him riding, and their relations seem to have been most friendly and intimate. At the trial Dr. Woodward testified that it was agreed between himself and the proponent that, if the marriage could be brought about and the will in question was made, then upon Paisley's death proponent was to pay him the sum of $4,000. It must be said, however, that Dr. Woodward was fairly impeached and there was testimony that his reputation for truth and veracity was bad. Notwithstanding this, certain facts and circumstances were shown which tended strongly to corroborate his statements.

It appears that Dr. Woodward was in the habit of taking Paisley into the country with him, and on these occasions he would talk to him about marrying Miss Cyphers, and would say to him that it would be no more than right and just for him to leave his estate to Miss Cyphers; that she loved him and cared for him. Woodward testified, and this is not disputed, that during the year previous to Paisley's death he (Woodward) saw Paisley nearly every day. On the morning of the day when the marriage took place he saw Paisley "about 15 minutes before he started to the county seat to be married." Woodward further testified that Paisley said to him that he was about to get married that day, "but I am not able, but I guess I will have to get married. I have told Miss Cyphers to put this off a while because my health is so bad, but Susie and your wife came to my house and said, 'If I didn't marry her at once, she would sue me for breach of promise.'"

The witnesses Brigham, Hanks, Hastert, Strain, Kinney, Stone, Anderson and Olson testified to Paisley's inability to express himself, and that he had difficulty in speaking. To the witness Cal White, the testator said that he did not think that he could live but a little while. He also said that he did not intend to get married, but that she insisted that they should, and that they were going to get married tomorrow. When the witness Joe Gubser shook hands with him at the court house and wished him much joy, Paisley said, "He didn't know whether there would be much joy the shape he was in." To witness Campbell he said, "Campbell, I am just all in." Paisley told the witness Lockard "that he hadn't intended to get married so quick; that Mrs. Woodward and Miss Cyphers came over to his place Sunday evening before this and talked it over and set the day for Thursday for the marriage, and that she had also threatened him with a lawsuit in case he went back on her and didn't marry her this time." He also testified that Miss Cyphers requested Paisley "to make her a trustee's deed to all of

his property." On the return of the party from Osceola on the day of the marriage, the testator immediately took to his bed, his ailments increased, and he died on the 7th of March following the marriage ceremony.

On the question of Paisley's mental condition and testamentary capacity, the evidence was conflicting; but it seems clear that however strong his mentality may have formerly been, his physical ailments were such that he was in a condition to be easily influenced and to fall an easy victim to the wiles of designing persons. It also clearly appears, considering his physical condition, that the proponent's motives in entering into the marriage relation with him could not have been the usual and proper ones of admiration, love and affection. She could have been prompted by nothing but a desire to obtain his property. She knew that in the nature of things Paisley had but a few days to live, and she no doubt concluded that she could, and would, endure him for a short time, although he must have been to her an object of disgust. Bearing upon the main question touching the question of undue influence by the proponent and her sister and Dr. Woodward, there was in evidence some statements made by the testator just prior to the ceremony which showed that he wanted to defer the marriage; but, because of the statement of the proponent that if he did not marry her he would be sued for a breach of promise, he hastened that event. It would seem to follow that the jury should have found that the will made by the testator was procured by means of undue influence on the part of proponent and her friends. The enfeebled condition of the testator is established by the testimony of all the witnesses who testify concerning the matter, and the evidence of Dr. Woodward concerning what he said and did to bring about the marriage is corroborated by the testimony of the witnesses Richard Clark, Ira Paisley, and the stipulation concerning the agreed testimony of John Fox. Undue influence and weakness of body and mind are often closely allied, and it may be difficult to tell exactly which

may have been the stronger factor in bringing about the result in any given case where the testator is enfeebled by illness, and has disregarded the natural objects of his bounty and has devised all, or the greater part of his property, to a stranger or to one whose integrity of purpose may well be questioned because of his conduct and his apparent self-interest as the chief beneficiary of the will, and because of his opportunity to exercise undue influence upon the testator. It is contended by the appellants that the evidence is insufficient to sustain the verdict. A careful reading of all the testimony contained in the bill of exceptions forces us to the conclusion that this point is well taken.

It is contended by the appellants that the court erred in instructing the jury as follows: "You are instructed that the fact that the proponent, Susie M. Paisley, and the decedent, Isaiah Paisley, were married, is not of itself undue influence. The law encourages marriage between men and women, and the fact alone and of itself that these parties contracted and entered into marriage relation would not raise any presumption whatever of undue influence." There is no doubt but that this instruction as an abstract statement is correct, but when given, as it was in this case, without explanation or modification so as to make it apply to the evidence and the conceded facts concerning the marriage, it must have been highly misleading and prejudicial and may have caused the jury to return a verdict for the proponent. The jury are told in the first sentence of this instruction that the fact that the Paisleys were married is not of itself any evidence of undue influence. The second sentence is the statement of justification, and that is, that the law encourages marriage between men and women; and then there is the statement that this fact alone and of itself does not raise any presumption of undue influence. The effect of this was to take away from the jury any consideration of the circumstances under which the marriage was contracted, the going over to the lawyer's office immediately after the per-

formance of the marriage ceremony, and having the will executed there, and the physical condition of the man on the day of the marriage. This instruction was also misleading because it seems to proceed upon the theory that some one was objecting to marriage as if it was not honorable, and that it was the duty of the jury to stand up for marriage. There was no issue of that kind in the case. There was danger that this instruction might be construed by the jury as a sort of license to the proponent to get married to the testator in any way that she could bring it about, and regardless of his condition. The evidence seems to establish the fact that this woman of 40, in good health and having plenty of force, got control of the testator and rushed him along towards the culmination of her desires to be his wife in name, so that she might have his property in fact. It would seem to be proper to cite a few cases properly applicable to the consideration of this one.

In the case of *In re Estate of Frederick,* 83 Neb. 318, this court, by REESE, C. J., said: "The evidence shows a state of mind throughout his whole life on the frontier and while an inmate of the soldiers' home at Leavenworth, which on some subjects was irrational and unreasoning, and which from imaginary and unreal causes would cause him to forget his obligations to his daughter, who in later years was in absolute want, with a family upon her hands, and whose husband had died. In the will presented, and which was the last of a number of wills made, he without any known cause practically disinherited his daughter and cast nearly all of his property upon a stranger to whom he was under no obligations and in no sense related. The evidence shows that he had at times taken a dislike to his daughter and determined to furnish her no aid or assistance, but, upon discussing the matter with friends, would declare she was worthy of his bounty and should have his property. This inclination would soon disappear, and he would declare his determination to leave what he had to strangers." The will was rejected.

13

In 1 Underhill, Wills, sec. 125, it is said: "The mental and physical capacity of the deceased is to be considered in determining what degree of influence will vitiate his will. * * * The will of one whose independence has been weakened by indulgence in dissipation, or whose stamina, physical or mental, has been broken by illness or old age, may be easily overcome. * * * *Every case depends wholly upon its own particular facts and attendant circumstances.*" Section 137: "The fact that the party superintending the execution of the will, or the person who propounds it for probate, takes a large benefit under it is a circumstance raising a suspicion of undue influence." Section 151: "Fraud employed in procuring a will, no less than coercion, may justify it being set aside. Both are equivalent to undue influence, and both are usually present in the same transaction." Section 148: "The motives that prompted the marriage upon the part of the proponent, the sickness and helpless condition of the testator at the time, the fact that the testator was an elderly man while the proponent was very much younger, the efforts of the proponent and of her parents and relatives to bring about the marriage, the poverty of the wife and the wealth of the testator, may all be considered on the issue of undue influence." *In re Estate of Wilcox,* 93 Mich. 438; *Reichenbach v. Ruddach,* 127 Pa. St. 564. Appeals to the affection and emotions of the testator, solicitation and persuasion may be carried to such a degree as to overpower his mind, and in such case will amount to undue influence. Page, Wills, sec. 128; *Higginbotham v. Higginbotham,* 106 Ala. 314; *Bevelot v. Lestrade,* 153 Ill. 625; *Rivard v. Rivard,* 109 Mich. 98; *Gordon v. Burris,* 141 Mo. 602; *Perritt v. Perritt,* 184 Pa. St. 131; *Orchardson v. Cofield,* 171 Ill. 14.

In *Orchardson v. Cofield, supra,* the court said: "It appears beyond cavil that Charles Orchardson entertained for this deluded old lady no single sentiment of affection or esteem, which must prompt every honorable marriage, and that he married her for money, and nothing else."

The woman in that case was 83 and the man was 57. She was wealthy. He called himself "The Son of Wisdom." He wrote a book in which he flattered the old lady. She paid the expense.of printing the book. The book, besides being written for the purpose of getting the old lady's money, was to reform the world.

The case of *Baker v. Baker,* 102 Wis. 226, is an instructive case touching the method of exercising undue influence upon the testator, as also concerning the proper rule applicable to all such cases.

In *Hampson v. Guy,* 64 L. T. Rep. n. s. (Eng.) 778, the court said: "I think the true result of the authorities is this, which has been already indicated by Lindley, L. J., that when you have a case of evidence tending to show some mental incapacity and also evidence tending to show undue influence, it is very much more easy to satisfy yourself that undue influence has been used where the mind of the person to whom it is addressed is evidently in a weak condition—two things which it was said here in the argument are almost inseparably connected—the amount of influence which would induce a person of strong mind and in good health to make a will according to the wishes of the persons who were attempting to induce such a testator must be very much greater than the amount of inducement which would improperly influence the mind of a person who was weak partly from mental infirmity and partly from ill health, as is the case here."

In *Hall v. Hall,* 18 L. T. Rep. n. s. (Eng.) 152, the testator told his brother, who was a witness in the case: "My wife is very vexed about the will I have made, and unless it is destroyed and a fresh one made she will give me no more rest." The husband wanted to make "peace and quietness" with her, but she was abusive and said of her husband "the black-looking thief has altered his will." The will was rejected.

In *Gordon v. Burris,* 141 Mo. 602, the evidence showed that the beneficiaries of the will, sons of the testatrix, were heard talking to their mother about making a will.

They said to her that they three ought to have the property. While they were talking the father came in, and he said: "Mother is sick, don't bother her now." In that case the granddaughter, for whom the testatrix wished to provide, was left out of the will. The reviewing court held that there was evidence of undue influence.

In *Carroll v. Hause,* 48 N. J. Eq. 269, the court said: "Against a beneficiary having a testator under his control, with power to make his will, the will of the testator, especially in a case where the testator has made an unnatural disposition of his property, the law presumes undue influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator."

In *Purdy v. Hall,* 134 Ill. 298, the court said: "Naturally, the mind sympathizes with the body in that which debilitates, and, even when not otherwise impaired, it may become so wearied from long continued, serious and painful sickness that it is willing to purchase rest and quiet at any price, and when in that condition it is susceptible to undue influence, and is liable to be imposed upon by fraud and misrepresentation. The feebler the mind of the testator, no matter from what cause—whether from sickness or otherwise—the less evidence will be required to invalidate the will of such person."

In *Brown v. Fisher,* 63 L. T. Rep. n. s. (Eng.) 465, the court held, adopting the language of certain cases cited: "The rules of law, according to which cases of this nature are to be decided  *  *  *  are two: The first is, that the *onus probandi* lies upon the party propounding a will, who must satisfy the conscience of the court that the instrument propounded is the last will of a free and capable testator; the second rule is, that if a party writes or prepares a will, under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilant and jealous in examining the evidence in support of the instrument,

in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper does express the true will of the deceased." In that case there seemed to have been suspicious circumstances, and the court refused to probate the will, and on appeal from such refusal the appeal was dismissed.

In *Hegney v. Head,* 126 Mo. 619, the court held: "Where a will is made in favor of one's spiritual adviser to the total or partial exclusion of the testator's lawful heirs, the burden of proof is on the devisee to show that the testator possessed testamentary capacity and that the will was not the result of undue influence."

In *Sheehan v. Kearney,* 82 Miss. 688, it was held that the proponents of a will have the burden of proof both as to testamentary capacity and undue influence.

In *Whitelaw's Ex'r v. Sims,* 90 Va. 588, it was held: "The fact that the will of a person 88 years old differs from her previously expressed intention, and is made in favor of those standing in a relation of confidence and dependence toward her, raises a presumption of fraud and undue influence, which must be overcome by satisfactory testimony in order that the will may stand."

In *Miller v. Miller,* 187 Pa. St. 572, it was held: "In a contest over a will in which a son is largely preferred, if it appears that the son, although not the father's attorney, was his trusted and confidential agent, the burden of proof is on the son to rebut the presumption of undue influence."

It is further contended that the court erred in refusing to give to the jury instructions numbered 1 and 2, requested by the contestants. To quote them would perhaps unnecessarily extend this opinion, and it is sufficient to say that they seem to contain a fair statement of the law, that they were applicable to the facts as shown by the evidence, and that they should have been given.

For the foregoing reasons, the judgment of the district court is reversed and the cause is remanded for further proceedings.

REVERSED.