IN RE ESTATE OF WILLIAM E. BAINBRIDGE, DECEASED. RICHARD O. JOHNSON, EXECUTOR ET AL., APPELLEES, V. RHODA OTLEY ET AL., APPELLANTS.

36 N. W. 2d 625

Filed April 7, 1949. No. 32543.

*Flansburg & Flansburg* and *John J. Wilson,* for appellants.

*Towle, Young & Mattson* and *Pierson & Scheele,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This is an appeal from the judgment of the district court of Lancaster County, Nebraska, admitting to pro-

bate as the will of William E. Bainbridge, deceased, an instrument dated June 11, 1945.

William E. Bainbridge was a resident of that county and died on the 25th day' of November, 1945. He left an instrument purporting to be his will, and proceedings had in the county court resulted in its probate. Contestants Rhoda Otley, Lurena Derieg, and George Derieg, appellants, appealed. The proponents, Richard O. Johnson, named in the will as executor, Guy Stickney, and Helen Seng, named in the will as beneficiaries, are the appellees. The grounds of the contest were that the deceased at the time of the execution of the document in question did not have testamentary capacity and that it was obtained through undue influence exerted ·upon the deceased by Guy Stickney. The court found and instructed the jury that there was no evidence from which it could find or determine that the purported will was in any manner the result of undue influence exercised upon the deceased, and the question for its determination was whether or not the deceased had testamentary capacity at the time he executed the alleged will. The trial resulted in a judgment sustaining the instrument as the will of the deceased. The motion of contestants for a new trial was denied.

An important inquiry, as this case is presented, is whether or not the trial court was justified in withdrawing from the jury the right to consider and determine the issue of undue influence. The answer to this is decisive of this case. It depends on whether or not the evidence of the appellants standing alone and accepted as true has probative force sufficient to make a prima facie case for them. The right to have the issue of improper influence resolved by a jury depends on the evidence submitted by appellants, and since a verdict was directed against them, they are entitled to have their evidence and all inferences fairly deducible therefrom viewed in the most favorable light. It is not permissible for this court to determine that undue influence

did or did not exist, but it may only decide whether or not sufficient evidence was produced to compel the submission of that issue to the jury and to sustain a finding that the will was the product of undue influence to which the testator was subjected. The court is therefore not concerned with the nature or the extent of the evidence of the appellees presented in opposition to or contradiction or explanation of the testimony of appellants. Any evidence in conflict with the testimony favorable to the appellants must be totally disregarded. Guyette v. Schmer, 150 Neb. 659, 35 N. W. 2d 689; In re Estate of Farr, 150 Neb. 615, 35 N. W. 2d 489; In re Estate of Noren, 119 Neb. 653, 230 N. W. 495; In re Estate of Bowman, 143 Neb. 440, 9 N. W. 2d 801; Phelps v. Metropolitan Utilities District, 120 Neb. 337, 232 N. W. 785.

Appellees concede this as the rule of law in this respect, but they claim that the assignments of error relate in part to instructions of the trial court on the issue of testamentary capacity as well as undue influence, and because thereof, the testimony of the witnesses of the appellees must be considered. The insufficiency of this contention is that appellants do not argue any assignment of error made by them except as it pertains to the error of the trial court in failing to submit the issue of undue influence to the jury; neither do they attempt to use any of the evidence offered by the appellees except as it bears upon the issue of undue influence. A determination that the trial court was correct in deciding the issue of undue influence as a matter of law would compel an affirmance, and a conclusion that the trial court was not justified in that regard would require a reversal.

The evidence proper now to be considered tends to establish that:

George and Mary Bainbridge, the parents, and Elizabeth, their oldest child and a sister of the testator William E. Bainbridge, were natives of England, migrated to

the United States and settled about four miles north-west of Waverly, Nebraska, about the year 1871. The parents had eight children, four of whom died during childhood, and the four who survived until the death of the testator were: Elizabeth, also referred to as Lizzie; Rhoda, also referred to as Rhodie; Lurena; and Ed, referred to as William E. The testator and his sisters lived in the family home and attended the same school.

Elizabeth helped with the work on the farm and did sewing for other persons. She married, became Mrs. Gillham, and moved to a farm west of Waverly. Later she and her husband separated. They had no children. She worked as a seamstress, and solicited and made sales of Avon Cosmetics. Her father gave her 160 acres of unimproved land near Waverly. She owned a residence where she made her home and a "town house" in Lincoln. She continued after the separation from her husband to sell cosmetics and work as a seamstress. She and her brother, the testator, had no quarrels or disagreements and at all times sustained friendly relations. No reason was known why he had any animosity towards her. On occasions Anna, the wife of the testator, called Elizabeth in Lincoln and she procured and took groceries from Lincoln to the home of her brother. She was a frequent visitor of her brother. Her father, George Bainbridge, died in 1930. His will was contested. She, her brother, and sister Lurena were the contestants. Her sister Rhoda was the proponent. There was in excess of $40,000 worth of property given to Rhoda by the will of her father. This angered the contestants and they tried to get a part of it. The contest resulted in prolonged litigation and was terminated in the Supreme Court. Elizabeth died in 1947, after the death of the testator.

Rhoda married Arthur Otley and they lived on a farm adjoining the farm of her father. Testator was not friendly with his sister Rhoda and entirely ignored her from the time of the contest over the will of their

father. "She has * * * lots of land"—300 acres north of Waverly, the land her father gave her, and she and her husband acquired more land.

Lurena married and became Mrs. Derieg about 1900, moved to a farm about four miles north of Waverly, and went to Oklahoma in 1906. She had seven children, all very young at the time of the death of their father in 1910. He homesteaded 160 acres of land near Carnegie, Oklahoma, about 75 miles west of Oklahoma City. The father of Mrs. Derieg a considerable time afterwards gave her 160 acres of land adjoining the land of her husband, $500 in cash, and after her husband's death paid a $1,400 mortgage on the Oklahoma property. The income from the land was not sufficient to meet the requirements of the family and it was very difficult for her to support and care for herself and her children. Her health failed and it was necessary to sell 80 acres of the land given to her by her father to meet "health expenses and bills." The testator knew of her burdens and difficulties. She was a frequent visitor at the home of her brother. She was in Lincoln, Nebraska, at the home of her son George several months each year for five years, from about 1941 until the death of the testator. During these years she, her son George, his wife and his children, were at the home of the testator almost every Saturday. There was a "natural feeling of brotherly love" existing between her and her brother and she was friendly with her sisters. When she was at the home of her brother, commencing in 1941 and continuing until his death, she observed that he drank beer and wine all through the day and kept them by his bed at night. He drank lots of wine. He said beer didn't agree with him. She saw lots of jugs and bottles around his premises—counted 50 jugs one day—most of them gallon and half-gallon size. Testator was sleepy, stupid, and laid around. When she saw him during 1944 and 1945 he would drink all during her visits. She was a contestant of the will of her father, paid no part of the

expenses of the contest, was a witness at the trial, and testified that her father was incompetent when he made his will. She saw testator in May of 1945, about a month before his death, about two weeks before his death, and on the night before and the day of his death, November 25, 1945. Lurena Derieg was 70 years old at the time of her brother's death.

Testator did not move around normally. He walked "stooped and * * * wobbly," could only walk very slowly, would stagger, stumble, and occasionally fall down, was unsteady, would set one foot and then the other to keep from falling down. He shuffled or trailed his feet and gave the impression that he was feeling his way along. He didn't take much interest in anything, complained his stomach hurt him. He would get up, walk around, go back and lie down, slept most of the time during the last two years. He ate very little—would go to the table, eat a few bites, and drink a glass of milk—ate less as he got older, and the last two years did not eat solid foods or much of anything but soup. He frequently became nauseated during meals when he tried to eat and would eject the contents of his stomach through his mouth on the table before he could withdraw, go outdoors and not come back. His conversations in later life were few and limited, generally concerning what he claimed some neighbors had done to him. He would say that they were not treating him square, were robbing him. He accused a boy who did chores for him of stealing his oats, did not talk normally, could not stay on one subject, could hardly tell anything. His mind "would drift from subject to subject" and sometimes he would hardly know anyone. He continued to drive his automobile though he had difficulty in operating it, would drive it off the road into the ditch, and on one occasion into and on the abutment of a bridge. He attended general farm sales and at one in 1917 a team of mules—one crippled—was offered for sale. No one seemed to want them. He bid and bought them for $525. Years later at another sale one of a

team of horses was offered with privilege to purchaser to take the team at double his bid. He bid $125 on the one offered and thought he was bidding on and buying the team. He had to pay double the amount for the team. When he bid at an auction sale he continued against all opposition until he purchased.

From the time he was about 20 years old until his death he habitually drank whisky, beer, and wine, except in the latter years he drank beer and wine. His drinking habits were "lifelong" and his indulgence in intoxicating liquor constant and continuous.

During the latter part of his life he was drunk all the time—didn't know what he was doing. His drinking and condition got progressively worse during the last twenty years. He was intoxicated everywhere, even when attending church and funerals. His appearance, color, and condition changed, and he became "puffy," "pasty," and "sort of yellow," and would shake all over. With one exception testator did not drink intoxicating beverages with any other person, and no one but testator drank intoxicating beverages on his farm.

The testator in the latter years of his life had weeping and whimpering spells. He indulged in self-pity about his sickness and stomach condition and "was very complaintive and * * * would weep sometimes and cry about his condition and about the way people treated him and such." After 1938 he was despondent much of the time and would whimper and whine and assert that he wasn't going to be here long—he was going to die, and sometimes he would "lay on the ground and would have to be helped up during his whimpering spells."

Guy Stickney became a tenant of testator in the spring of 1944, and had been a tenant on the Shea farm, southwest of Waverly, before that. Three witnesses stated they had not heard him mention Guy Stickney before he moved on the farm of the testator as his tenant. The testator was afraid to drive his car and after he ceased operating it Stickney would sometimes drive his car

when the testator was not with him, and on other occasions Stickney and sometimes his wife drove testator's car for him and would bring him groceries and supplies and would drive him to and from his farm, and on these occasions empty beer bottles were taken to the car by Mrs. Stickney and full ones brought home by Mr. Stickney. Other persons—tenants, neighbors, friends, and a relative—performed like services and rendered him the same or similar assistance, including the handling of his beverages and the containers thereof. Clarence Veeder, a tenant of the testator before Stickney became his tenant, and Mr. Stickney made a trip in the fall of 1944 to Lincoln and Havelock to get machine repairs, and Stickney bought two half-gallons of wine for testator. He was friendly with the testator, they would sometimes visit at the place where Stickney was working on the farm and the testator would assist while they visited. He was with testator on one of his visits to his doctor. Guy Stickney did not drink intoxicating liquors.

There were no improvements made on or to any building or structure on the land of testator from 1934 to 1944 except he furnished $10 for wallpaper. Shortly after Guy Stickney became his tenant, a chicken house and garage were built, a little shed on the barn was remodeled, the cribs and cow barn were fixed up, and the house painted.

George E. Derieg, son of Lurena Derieg, a nephew of testator, lived in Lincoln from 1927, and visited many times at the farm of his uncle. He husked corn there in 1927 or 1928. His early visits were social and about twice monthly until 1935. From then to 1938 about weekly, and from then until 1945 once and sometimes two and three times each week. His wife and later their children accompanied him. About 1938 testator asked his nephew to make a garden on the Bainbridge farm so both their families could share the produce raised. From then until the spring of 1945 Derieg and his family visited the farm of his uncle during off-duty

hours—he was a nurse—prepared the ground, planted, and cared for a vegetable garden of an acre or more, planted trees, made a chicken lot, fixed fences, and did other similar work. Testator on occasions hauled cases of beer out to his farm in his car and was not able to carry them into the house, and his nephew, George E. Derieg, carried the cases of beer into the basement and carried the empties out and put them into the car of the testator at his request. Mrs. Derieg was at the farm with her husband quite regularly until 1941 and occasionally until February of 1945, and assisted her aunt, Mrs. Bainbridge, who was badly crippled, in getting meals and cleaning the house when she needed help. Neither George E. Derieg nor his wife expected compensation and received none except such vegetables as they took from the garden. They enjoyed getting out of the city and working in the open air, the sunshine, and the earth, and their uncle and aunt needed their assistance. The friendly relations between Derieg and his uncle changed "during the later years" when he was going to the farm of his uncle. The difference of attitude of the testator was not so much as to his nephew as towards the other members of his family. It was more apparent and demonstrated during the last year of the life of the testator. He became suspicious of Derieg and his family and would inspect their car before it left his farm. Testator suspected the boys of Derieg of taking his saw and hammer. Mrs. Derieg, the wife of George E. Derieg, last saw the testator in February of 1945 at his home when all the members of her family and Lurena, her mother-in-law, were present, and she could not remember when she was there before that date. There was a rather violent disagreement between testator and his nephew George E. Derieg in the spring of 1945—probably May—and he "bid Mrs. Bainbridge goodbye; and we departed and didn't return."

Testator consulted and was treated by a physician at his office eight times, commencing with May 28, 1945,

to and including October 25, 1945. The treatment was vitamin B complex, prescribed for chronic alcoholism, in capsule form taken by mouth, and later administered by injection into a vein. Hospitalization was advised as essential, but was refused. His history, symptoms, and conditions were: Pain in the upper right quadrant of the abdomen over the liver area; vomiting; muscular tremor; drinking several bottles of beer and wine each day; inability to eat and assimilate ordinary foods; eyeballs yellow; tongue trembled; fell to the floor in removing his coat; had to be helped off and on the table in the doctor's office; and was intoxicated when he came to the office. The last time he was at the office he was very shaky, had been vomiting for a week, unable to retain ordinary food but able to drink intoxicating beverages, practically living on liquor, was quite bloated, his belly, face, feet and legs were enlarged. He was very dropsical and suffered from cirrhosis of the liver, caused by alcoholism. Diagnosis was chronic inebriacy.

The doctor testified alcohol is a poison and alcoholism a disease; affects the central nervous system and all organs of the body; one of the causes of cirrhosis of the liver is alcoholism; most chronic alcoholics experience morning vomiting, muscular tremor, and a causeless mental restlessness; the testator experienced all of these; the will and power of a person to resist the influence of others is weakened by chronic alcoholism; and the normal reaction of the victim to persons who attempt to induce a reduction or discontinuance of his drinking activities is the victim usually refuses to do so and may become the enemy of the one making the suggestion. A chronic alcoholic is more inclined to befriend a person who assists him in satisfying his desire for intoxicants. The discontinuance of drinking alcoholic beverages by a chronic alcoholic for a short period would not restore his normal faculties. These are restored only by a course of treatment, and it may be impossible to obtain a restoration of them. It was the opinion of the doctor

that on June 11, 1945, testator was not mentally capable of understanding the effect and nature of the instrument offered for probate; that he did not have the power to realize the ties of blood relationship.

A specialist in neurology and psychiatry stated: Alcoholism, acute or chronic, is a disease. Chronic alcoholism causes defects in judgment and changes in personality make-up, often spoken of as mental deterioration, because of which the will is weakened, emotional control is lessened, and defects in judgment occur. The seriousness of the effect on the mental faculties of the use of intoxicating beverages depends upon the length of time of the use. Duration of use is a most important factor. The effect is more likely to be deleterious upon the mental faculties of the steady, persistent drinker. Chronic alcoholism may result in permanent impairment of mental faculties, and the permanency of the impairment depends to a great degree upon the duration and extent of the alcoholism. A short period of abstinence from the use of intoxicating beverages would have small effect upon the restoration of a chronic alcoholic of his normal mental faculties, but would make him more emotional and unsteady, because of the absence of the sedative effect of alcohol to which he is accustomed. The length of time required through abstinence to regain normal mental faculties, if regainable, depends very much on the length and duration of the period of drinking and the chronic character of the alcoholism. The effect of chronic alcoholism is to increase the personality defects and eccentricities of the person affected. If he has been emotional, he will be more emotional; if he has been subject to mood swings, he will probably be more that way. Alcohol is a sedative and it calms the person temporarily who has become accustomed to its use, and an alcoholic may by virtue of his indulgences be apparently normal, but in fact be suffering from physical and mental unbalance. He might carry on ordinary business transactions in a seemingly normal

manner. A chronic alcoholic often walks in a shuffling manner—unsteady and stumbling—and this may be evidence of the effect of alcoholism upon his nervous system, and damage to it results in impairment of the natural faculties. A chronic alcoholic is apt to befriend those who drink with him and aid him in keeping up his habits. He is likely to be antagonistic to those who try to help him reduce his drinking and because of his judgment defects he is more easily led—more susceptible to outside influence. Alcoholism is not easily controlled or disciplined by direct approach, but if an idea can be planted in the mind of the subject, he can carry it through with determination. In evaluating the extent of alcoholism in any instance, the presence of bloating of the ankles and face, a swelling of the abdomen, cirrhosis of the liver, inability of the subject to retain solid foods, and his subjection to vomiting spells, are given consideration and their existence indicates a very marked involvement. Alcoholism affects the body primarily through the vascular system and when it has existed for a time and to a degree sufficient to upset the circulation so that the kidneys and liver are involved, this causes the bloating, and thereby it is known that the vascular organism is involved and that every organ in the body is affected, including the brain, and this all indicates that there has been a great deal of vascular deterioration. This specialist expressed the opinion that the mental capacity of the testator in June of 1945 was such that he could not understand the nature and effect of the instrument intended to be his last will and testament.

Testator was a farmer and stockman. He owned about 600 acres of land. He rented some of his land. He did no actual field work, but he managed all of his business until the time of his death. His parents deeded him Lots 1 and 2 in the northeast quarter, and the southeast quarter of the northeast quarter of fractional Section 6, Township 11 North, Range 8 East, of the 6th P. M.,

about 113 acres, on June 7, 1907, for a consideration as recited in the deed of $8,000; and the northwest quarter of Section 5, Township 11 North, Range 8 East, of the 6th P. M., about 160 acres, on January 22, 1910, for a consideration as recited in the deed of $16,000; George A. Balis and Laura M. Balis deeded him the south half of fractional Section 6, including Lot 4 therein, containing 134.8 acres, and the west half of the southwest quarter of Section 5, containing 80 acres, all in Township 11 North, Range 8 East, of the 6th P. M., on March 3, 1913, for a consideration as recited in the deed of $28,998, subject to a first mortgage thereon of $4,000 given to Union Central Life Insurance Company, and testator gave to George A. Balis a second mortgage, bearing date of March 3, 1913, on the land last above described, for the sum of $10,000. There is evidence that testator stated that his father gave him the "Bayless farm." His father deeded him Lots A and B in Stephen· B. Clark's plat of the south half of Section 18, Township 11 North, Range 8 East, of the 6th P. M., about 100 acres, on May 29, 1925, for a consideration as recited in the deed of one dollar and love and affection.

Testator made a will on February 11, 1942, by which he gave his personal property and a life estate in his real property to his wife, Anna L. Bainbridge, and subject thereto he devised his real estate as follows: To his nephew, George Derieg, the east half of the southeast quarter, and Government Lot 4 in the southeast quarter of Section 6, and the west half of the southwest quarter of Section 5, all in Township 11 North, Range 8 East, of the 6th P. M., Lancaster County, Nebraska, and Lots A and B of Stephen B. Clark plat of Section 18, Township 11 North, Range 8 East, of the 6th P. M., Lancaster County, Nebraska; to Helen Johnson Seng, the northwest quarter of Section 5, and the southeast quarter of the northeast quarter and Lots 1 and 2 in the northeast quarter of Section 6, all in Township 11 North, Range 8 East, of the 6th P. M.

He made another will, the subject of this litigation, on the 11th day of June, 1945, by which he gave his household furniture, goods, and personal effects in the home, and a life estate in his real estate to his wife, Anna L. Bainbridge; $100 to his sister Elizabeth; $25 to his sister Lurena; nothing to his sister Rhoda; $5 to each of his nephews, George Derieg and Michael A. Derieg, and subject thereto he devised real estate as follows: To Helen Seng (nee Johnson) the northeast quarter of Section 5, Township 11 North, Range 8, Lancaster County, Nebraska, containing 159.13 acres; and the west half of the northeast fractional quarter of Section 6, Lancaster County, Nebraska, containing 70.51 acres; and the southeast quarter of the said northeast quarter in said Section 6, Township 11 North, Range 8, Lancaster County, Nebraska, containing 40 acres; to Guy Stickney, the west half of the southwest quarter of Section 5, Township 11 North, Range 8, Lancaster County, Nebraska, containing 80 acres; and the east half of the southwest quarter of Section 6 in Township 11 North, Range 8, Lancaster County, Nebraska, containing 8 acres; and all of Government Lot 4 in the south half of Section 6, Township 11 North, Range 8, Lancaster County, Nebraska, containing 54.08 acres, described otherwise as fractional south half of Section 6, Township 11 North, Range 8, Lancaster County, Nebraska; and Lots A and B of Stephen B. Clark's plat of the south half of Section 18, Township 11 North, Range 8, Lancaster County, Nebraska, containing 100.53 acres. Guy Stickney was named as residuary legatee and devisee and all former wills were revoked.

Testator did not own the northeast quarter of Section 5 attempted to be devised to Helen Seng. He did own the northwest quarter of said Section 5. Likewise, testator did not own the southwest quarter of the northeast quarter of fractional Section 6, also known as Lot 3, attempted to be devised to her. He did own Lot 1 in the northeast quarter of said Section 6, which is not mentioned in exhibit 1.

The east half of the southwest quarter of Section. 6, described in exhibit 1, was not owned by the testator. There is no such property in Lancaster County, Nebraska, because Section 6 is a fractional section—is less than a half-section, and all there is of it is in the east half of the section.

William E. Bainbridge died on November 25, 1945, leaving surviving him his wife, Anna Bainbridge, who died in the year 1946, his sisters, Elizabeth Gillham, Lurena Derieg, and Rhoda Otley, as his heirs. Helen Seng was related to the testator by affinity only—she was a niece of his wife.

The essential elements of undue influence sufficient to defeat a will are: That opportunity to exercise it exists; that the testator was susceptible to such influence; that there was a disposition to exercise it for an improper purpose; and that the result clearly appears to be the effect of such influence. In re Estate of Farr, *supra;* In re Estate of Keup, 145 Neb. 729, 18 N. W. 2d 63; In re Estate of George, 144 Neb. 887, 15 N. W. 2d 80; In re Estate of Bowman, *supra.*

The burden is on contestants to produce evidence tending to prove each of the four elements stated above, as a prerequisite of their right to have the issue submitted to a jury for determination. In re Estate of Farr, *supra;* In re Estate of George, *supra.* If any one of the essential elements enumerated is not supported by evidence or reasonable inference drawn from a fact or facts otherwise established, the contention of undue influence must be rejected. The evidence must tend to show undue influence directly in reference to the will in question, and be of such a nature as to control the will of the testator and cause him to do something that he did not intend. Suspicion or supposition of undue influence is not sufficient to require the submission of the question to a jury or to sustain a verdict. In re Estate of Bayer, 119 Neb. 191, 227 N. W. 928; In re Estate of Keup, *supra;* In re Estate of George, *supra.* Whether or not the evi-

dence and the inferences permitted to be deduced therefrom are sufficient to provide a question of fact on the issue of undue influence depends upon the facts and circumstances of each case and this must be determined by applying thereto the law governing this class of cases. In re Estate of George, *supra*.

In evaluating the testimony and proper inferences therefrom, it is not always possible to apply the evidence tending to establish improper influence which is referable to the will solely to one of the essential elements. Parts of the evidence tending to show undue influence may have probative value as to the existence of one or more of the elements thereof. A will containing unnatural provisions and gross inequality of distribution of the estate of the testator inconsistent with his duty to the members of his family, may afford evidence or inference that the testator was a person susceptible to influence, a disposition on the part of the beneficiary under the will to influence him, and that the result of the will may have been brought about by the exercise of improper influence. Evidence of ill health and mental defects of the testator may tend to support the element of susceptibility of the maker of the will and when supplemented by evidence of a contribution to the diseased condition of the mind of the testator by the person charged with having exercised illegal influence such as assisting him in continuing his excessive indulgences, the evidence becomes indicative also of the disposition of the person charged with improper conduct to exert improper influence over the testator. The fact that the person against whom undue influence is asserted is a very substantial beneficiary of the will under consideration, and also a recent acquaintance of the testator at the time of the execution of the will, may tend to prove that he was susceptible to influence, that the beneficiary had a disposition to exercise influence upon the testator, and that the result shows that the will was the effect of improper influence. Likewise, evidence tending to show that the regard and

affection of the maker of the will for those named by him in a previous will as beneficiaries was destroyed during the time the testator was in association with and under obligation to the person against whom influence is charged may have probative value in justifying a finding that the testator was subject to improper influence, that the person charged therewith may have had a disposition to exercise such influence, and that the will was the result of the influence so exercised. It is permissible therefore not to strive to separate each fact supported by evidence offered as proof of undue influence and allocate it under one or more of the four essential elements requisite to establish the exercise of undue influence, but to view the entire evidence offered by the contestants as proof of this issue and rest the decision upon whether or not the evidence as a whole is of such a substantial nature as to contain some proof of each of the essential elements, and to require that the issue of undue influence be submitted to and determined by a jury.

Guy Stickney moved on the land of the testator as a tenant in March, 1944, and continued that status until the death of the testator on November 25, 1945. The will in question was made on June 11, 1945. The acquaintance of the testator and Guy Stickney before he became the tenant was casual and limited. There is evidence that the testator had not spoken of Stickney before he moved on the farm. There were two sets of buildings on the land. The tenant lived in the house on what is referred to in the evidence as the north farm, and the testator lived in the house on what is referred to in the evidence as the south farm, or the Balis land. The houses were about three-quarters of a mile apart. The land was in a farming community and surrounded both houses. Testator and Stickney were friendly. They sometimes visited at the place on the land where Stickney happened to be working on the farm when the testator was out on the land, and he would assist while they

visited. Stickney sometimes drove the automobile of the testator when he did not accompany it. On other occasions Stickney and sometimes his wife drove the car of the testator for him on trips to and from his farm and would bring him groceries and supplies, and on some occasions Mrs. Stickney was seen to carry empty beer bottles to the car of the testator and Mr. Stickney was seen to bring full beer bottles to the Bainbridge home. He, in the fall of 1944, was known to have purchased in Havelock two half-gallon bottles of wine for the testator. It is a permissible inference from this evidence that Guy Stickney aided testator in reference to his intoxicating beverages and in one instance purchased wine for him; that testator traveled with great difficulty the last years of his life, but was at all times bountifully supplied with intoxicating beverages, and that Stickney was the one who did errands for him; that Stickney assisted the testator in securing and having all the intoxicating beverages he desired; he must have known the deplorable physical and mental condition of the testator and he must have had a motive for what he did in this regard, and it is reasonable to infer that his motive may not have been entirely free from selfishness. He was with testator on one of his visits to his doctor. He had frequent access to personal contact and association with the testator. The evidence of contestants tends to show that opportunity existed for Guy Stickney to have exercised undue influence over the testator, in reference to his will.

There is evidence tending to show that testator from the time he was about 20 years of age habitually drank intoxicating beverages and his indulgences in this regard and his physical and mental condition resulting therefrom got progressively worse during the last twenty years of his life; that during the latter part of his life he was continuously under the influence of intoxicating beverages; he could eat and assimilate only liquids, most foods nauseated him, and he substantially lived on wine; he was sleepy, stupid, and nearly bedfast much of the time;

his conversations were limited, filled with expressions of unjustified suspicion and charges of misconduct of others, and characterized with lack of continuity of thought and expression; he was morose—indulged in self-pity—complained and would weep at times about his condition, and, without foundation in fact, the way he was treated; he became despondent, would whimper, whine, and assert that he would not be here long—he was going to die; he became discolored, bloated, and afflicted with muscular tremor, dropsy, and cirrhosis of the liver; he was a chronic alcoholic; all of the organs of his body were affected and he sustained mental defects and deterioration; he was a victim of weakened will and emotional control and was subject to defects in judgment; and he had in all respects degenerated physically and mentally. He had lived all his life on or near the land he owned at the time the will was made. All of it except the Balis land—the west half of the southwest quarter of Section 5, and the south half of fractional Section 6, Township 11 North, Range 8 East, of the 6th P. M.—was acquired by him from his father. He failed to devise about 200 acres of the land he owned; he attempted to devise three parcels of land he did not own. The evidence of contestants tends to show that the testator was susceptible to undue influence.

The conduct of Guy Stickney and his wife in assisting testator in having continuously the intoxicating liquor he desired, as indicated by the evidence and reasonable inferences therefrom as above noted, may have had the effect on the testator of imbuing him with a great sense of gratitude and obligation to Guy Stickney. There is evidence to the effect that this could be the result of such conduct; that a chronic alcoholic such as the testator would take into his confidence and feel an affection and obligation towards anyone who assisted or encouraged him in the continuance in his indulgences in intoxicants and aided him in satisfying his desire for such beverages; that the extent and duration of the drinking of a chronic

alcoholic determines the extent of the damage to and impairment of his mental faculties and the degree of the destruction of his normal will power, the longer and the more he indulges, the more susceptible he may become to suggestions and desires of others. There is evidence indicating that Stickney was subservient to the wishes and desires of the testator as indicated by his assisting him with his intoxicants, operating his automobile for him, making Mrs. Stickney available for this purpose, and in securing and taking to his home groceries and supplies and performing similar services. That the testator was disposed to reciprocate might be found from the evidence that during the period of 1934 to 1944 he did not make much needed improvements on the structures on his farm where his tenants lived, and made only a nominal contribution for wallpaper for the dwelling, but soon after Stickney moved on the farm, two new small buildings were added, repairs made to other buildings, and the house painted. Guy Stickney was made the beneficiary of a large part of the estate of the testator in place of his nephew, George Derieg, to whom he had by a former will, executed about three years previous, devised the exact properties now given to Mr. Stickney by the provisions of the contested will. The former will was revoked on June 11, 1945, when the last will was made, and after Mr. Stickney had been tenant of the testator about fifteen months, and, as the evidence indicates, after the affection and regard of the testator for his nephew had been destroyed during the period of the tenancy of Mr. Stickney. The change in the attitude of the testator, if the last will is sustained, reduced George Derieg, the nephew, from the beneficiary of about 315 acres of land to a legacy of $5, practically disinherited all of the near relatives of the testator and changed a tenant, a stranger to the testator, to a landowner of about 315 acres. This indubitably reveals a striking change in attitude of the testator. It is possible, of course, that this, great and strange as it was, might have resulted naturally,

and if so, the testator had a right to disinherit his relatives, and refrain from any gift to his nephew whom he had felt justified in remembering so generously in a former will. It must be appreciated that it might have been brought about by the exercise of undue influence on the part of Guy Stickney. It must also be recognized that the interest which he took in the testator may be attributed to kind and benevolent motives, but it could be that such interest did spring from selfish and mercenary motives. It is because of such alternatives, concerning which reasonable minds do differ, that a question of fact arises which is proper for the consideration of a jury. It cannot be said as a matter of law that there is no evidence in this case of the disposition of the beneficiary to exercise undue influence over the testator.

There is evidence from which it could be found that a considerable part of the land owned by the testator at the time of his death came from his father. Notwithstanding this, he, by his last will, disregarded his nearest relatives, his sisters, and also one of his nephews whom he had not so long before recognized as a deserving object of his bounty, and he substituted strangers to his blood, a niece of his wife, and a tenant of short acquaintance, as his beneficiaries. This is not a case of unequal division between relatives of the testator, but the enrichment of a stranger. It could be found that there were good reasons why the testator excluded his sister Rhoda, but his revulsion of feeling as to his sisters Elizabeth and Lurena, with whom he had always, even to the hour of his death, sustained friendly relations and frequent contacts, is not so easily explained, and is not convincingly accounted for in this record. It could have been outside influence improperly exercised over the testator as charged herein. The evidence that George Derieg, nephew of the deceased, was for a considerable time a favorite of the testator, to whom he appealed when he needed assistance and from whom he accepted many kindnesses, is of peculiar importance in

this connection. The record indicates this nephew was in financial need of the consideration of his uncle. There is, of course, a reason why he refused that consideration. It could have been improper influence. There is evidence tending to establish the essential element that the result as shown by the will of the testator may have been the effect of improper influence.

Undue influence is largely a matter of inferences from facts and circumstances surrounding the testator, his life, character, and mental condition, and the opportunity existing for the exercise of improper control. In re Estate of Noren, *supra*. If a will contains unnatural provisions, it deserves close scrutiny. In re Estate of Bowman, *supra*. The fact that a beneficiary was a comparative stranger to the testator is a suspicious circumstance to be considered on the issue of undue influence. In re Estate of Paisley, 91 Neb. 139, 135 N. W. 435; In re Estate of Frederick, 83 Neb. 318, 119 N. W. 667.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

CARTER, J., dissenting.

I am not in accord with the majority opinion. It is the law of this state that the elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: That the testator was subject to such influence, that the opportunity to exercise it existed, that there was a disposition to exercise it, and that the result appears to be the effect of such influence.

It is my contention that the facts shown in the majority opinion fail to show by sufficient evidence that there was a disposition on the part of the devisee, Stickney, to exercise undue influence. Every statement in the majority opinion on this point is as consistent with Stickney's relationship to the testator as tenant or neighbor as it is with that of substituting his will for that of

Bainbridge in the testamentary disposal of the latter's property.

I submit that there must appear in the record somewhere, if undue influence is to be submitted to the jury, some evidence which can be accounted for only on the basis of a disposition on the part of Stickney to exercise undue influence. No such evidence is set forth in the majority opinion.

We have repeatedly held that every sane person is entitled to will his property as he sees fit, except where he has been limited by statute. He has a right to give it to relatives, to strangers, or to charity. If the conclusion reached by the majority is correct, the jury is entitled to pass upon the question of undue influence where the relationship of the parties is put before them, even if there is not a syllable of evidence which can be accounted for only on the basis of a disposition of the one charged, to influence the making of the testator's will. The practical effect of such a holding is to make the execution of any will subject to the approval of a jury where undue influence is charged.

The right of a person to dispose of his property by will rests on a much more secure foundation than this. Isaac v. Halderman, 76 Neb. 823, 107 N. W. 1016; In re Estate of Bose, 136 Neb. 156, 285 N. W. 319; In re Estate of Scoville, 149 Neb. 415, 31 N. W. 2d 284. This case is very important to those who desire to make a testamentary disposal of their property. One who desires to make an unnatural disposition of his property, for reasons best known to himself, is seriously restricted by the majority opinion. Juries are inclined to sustain charges of undue influence in the drafting of wills which they deem to be unfair to the natural objects of testator's bounty. But the maker of a will has a right to be unfair in disposing of his property without revealing his reasons therefor. I submit that if evidence is not required, which can be accounted for solely on the basis of a disposition to influence the testator, there is no

question of undue influence, as a matter of law, to be submitted to a jury. Undue influence cannot be inferred alone from motive or opportunity, and mere suspicion of undue influence on the testator is insufficient to require submission of the question to the jury or to sustain a verdict and judgment. In re Estate of Inda, 146 Neb. 179, 19 N. W. 2d 37; In re Estate of Woodward, 147 Neb. 270, 23 N. W. 2d 75. See, also, In re Estate of Heineman, 144 Neb. 442, 13 N. W. 2d 569.

In my judgment, the trial court correctly analyzed the evidence and properly directed a verdict in favor of the plaintiff.

The judgment should be affirmed.

I am authorized to state that Judge Chappell concurs in this dissent.